**IN RE Edsel ADAMS and Frances T. Adams, Debtors.**

**BARCLAYS/AMERICAN BUSINESS CREDIT, INC., Plaintiff–Appellee,**

v.

**Edsel ADAMS and Frances T. Adams, Defendants–Appellants.**

No. 93–5447.

United States Court of Appeals, Sixth Circuit.

Argued March 25, 1994.

Decided Aug. 3, 1994.

C. William Denton (briefed), David J. Cocke (argued and briefed), F. Guthrie Castle, Jr., Borod & Kramer, Memphis, TN, for plaintiff-appellee.

John D. Horne, Memphis, TN (argued and briefed), for defendants-appellants.

Before: KEITH and MARTIN, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Edsel and Frances T. Adams appeal the decision of the district court affirming the bankruptcy court's denial of a discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(2)(B), and imposition of a $686,227.14 money judgment, plus interest, in favor of Barclays/American Business Credit, Inc. The Adamses maintain, under Section 727, that they did not hinder or delay collection of their debt, and argue that Barclays did not dispose of their inventory in a commercially reasonable manner. The Adamses also con-

tend that the bankruptcy judge was biased against them, and should have recused himself pursuant to 28 U.S.C. § 455. The district court rejected each of these arguments. For the following reasons, we affirm the judgment of the district court.

## I

During the 1980s, Edsel and Frances Adams wholly owned and controlled three corporations operating in Alabama and Arkansas: Adams Plywood, Inc., West Memphis Plywood Corporation, and Magic City Plywood. Adams Plywood sold hardwood veneer plywood, which was manufactured at two plant sites controlled by Adams Plywood and West Memphis Plywood. Adams Plywood owned all of the inventory at both plant sites. Magic City Plywood was a wholesale plywood distributor that usually bought materials exclusively from Adams Plywood for resale to small cabinetmakers.

Barclays/American Business Credit, Inc., is a commercial lender that supplied operating capital to Adams Plywood under the terms of a secured lending agreement dated July 26, 1983. Pursuant to the agreement, Barclays advanced funds to the Adamses based on the Adamses' pledge of accounts receivable and inventory. Each time they made shipments on credit to their customers, the Adamses filled out Barclays pledge reports indicating the creation of an account receivable. They then received an immediate eighty-five percent cash advance on that account. Upon collection of the account, the Adamses were required to report the receipt of funds to Barclays and to deposit the proceeds into a "dominion account" at a Memphis, Tennessee bank, from which account only Barclays could withdraw money. The proceeds were credited to the loan balance, thereby reducing the Adamses' indebtedness. Barclays also agreed to advance amounts of up to fifty percent of the value of the Adamses' inventory, with the inventory serving as collateral. All of these lending arrangements were personally guaranteed by the Adamses.

In the fall of 1983, the Adamses began experiencing financial difficulties. In order to make payments to their suppliers, the Adamses, without Barclays' knowledge or permission, transferred inventory in which Barclays had a security interest to unsecured creditors in lieu of cash. The Adamses effectuated this transfer because the West Memphis plant had ceased operations in December, due to a default on a $250,000 bond with the City of West Memphis. In early December, the Adamses also transferred their only unencumbered assets, Magic City Plywood stock and a property in Abbeville, Alabama, to their daughters for no consideration.

By February 1984, some of Adams Plywood's suppliers were submitting unfavorable credit reports, and the Adamses were having difficulty collecting on their accounts receivables. Under the loan agreement, accounts not collected within sixty days became ineligible as collateral, and reduced the amount of advances that could be made against new accounts. Adams Plywood was also accumulating an inventory of unsold goods, which originated from the West Memphis plant that had been shut down in December. Much of this inventory was apparently of less than "top grade" quality, which had a direct effect on sales. Barclays representatives Michael Faircloth and Barry Johnson met with Edsel Adams on March 26, and warned him that the lending agreement would have to be reassessed if these trends continued. By April, Adams Plywood had a serious cash flow problem. In mid-August, Barclays notified the Adamses that it would insist on a plan of orderly inventory liquidation, to begin on September 1, if their cash flow situation did not improve.

On August 22, Adams Plywood filed for Chapter 11 bankruptcy protection. A subsequent audit of the company's books and records revealed that by August 21, the Adamses had deposited $150,000 in Adams Plywood accounts receivables in their corporate bank account, rather than in Barclays' dominion account as required by the loan agreement. The Adamses kept these deposits secret through the use of a "check-kiting" scheme, which involved falsely reporting "contemporaneous collections," drawn on the corporate account and deposited in the dominion account well after the collection actually occurred, while keeping the corporate account solvent by depositing new customer collec-

tions therein. Through the use of this scheme, the Adamses were able to delay reports and payments to Barclays.

The audit also revealed that, in the two weeks after the Chapter 11 filing, the Adamses opened a checking account in a Memphis Bank with $99,000 in funds drawn from the Adams Plywood corporate account, and subsequently withdrew $49,000 from this checking account. The proceeds of a $15,000 check from Magic City Plywood were also unaccounted for. On September 6, Barclays obtained a temporary restraining order from the bankruptcy court prohibiting further unauthorized, post-petition disbursements from these accounts. After unsuccessfully demanding that the Adamses pay their debt in full, Barclays filed suit in North Carolina district court on September 21, seeking payment pursuant to the Adamses' personal guarantees. This action by Barclays caused the Adamses, in turn, to file a Chapter 7 bankruptcy petition on October 9.

Further investigation by Barclays subsequently revealed that on August 28, Mrs. Adams had cashed a $12,000 check with funds from the Adamses' personal bank account, and deposited that money, along with her husband's paychecks, in a new account opened in her maiden name at another bank. The Adamses used this money, in part, to pay living expenses and their bankruptcy attorney at the time. The Adamses also apparently converted almost $10,000 of the Chapter 7 estate after the filing of the petition.

On November 20, the Adamses filed a "Schedule of Affairs" with the bankruptcy court in which they made numerous material misrepresentations regarding their pre- and post-petition transactions. The Adamses subsequently agreed to abandon their inventory to Barclays for a minimum $250,000 credit on their debt. After conducting a public sale, Barclays took possession of the inventory for the agreed-upon $250,000 because no higher bid was received. Barclays then filed the present adversary action on May 11, 1985, asking the bankruptcy court for a finding that the remainder of the Adamses' debt was non-dischargeable, and also seeking a money judgment.

After a lengthy trial, the bankruptcy court rendered its decision on June 18, 1986. The bankruptcy court refused to void the Adamses' pre-petition transfers of the Abbeville property and the Magic City stock to their daughters, as the transfers were not voidable under the terms of 11 U.S.C. § 548(a). The bankruptcy court also found, however, that the remainder of the Adamses' financial activities were conducted with the intent to hinder or delay creditors within the meaning of 11 U.S.C. § 727(a)(2)(A) and (a)(2)(B). The court thus denied the Adamses a discharge of their debts under Chapter 7. On June 27, the bankruptcy court entered judgment for Barclays in the amount of $731,-367.74, and the Adamses appealed.

Barclays subsequently filed a motion for clarification in the bankruptcy court, asking for a finding that its disposition of collateral was commercially reasonable, and requesting that the court make additional dischargeability findings under 11 U.S.C. § 523(a)(2) and (a)(4). On October 3, the court ruled that Barclays disposed of the collateral in a commercially reasonable manner pursuant to North Carolina General Statute § 25-9-601 et seq., which was the controlling law under the security agreement. The court declined to make alternative dischargeability findings under Section 523(a) of the Bankruptcy Code.

On October 14, the Adamses filed a revised notice of appeal, referencing both of the bankruptcy court's orders, in the United States District Court for the Western District of Tennessee. On November 24, the Adamses filed a motion in the bankruptcy court to reopen the case for a new trial, and to disqualify the bankruptcy judge on the grounds of personal bias, prejudice, and questionable impartiality. The bankruptcy court denied this motion on March 4, 1987. On March 9, the Adamses filed a notice of appeal from this decision, and the district court subsequently consolidated all of the Adamses' appeals. On January 30, 1992, the district court affirmed the bankruptcy court as to the merits on all counts, but remanded the case for a particular accounting of attorney's fees and costs. In accordance with the district court's order, the bankruptcy court

revised its calculations and imposed a money judgment of $686,227.14. The district court then amended its previous order to incorporate the bankruptcy court's revised ruling, and certified the amended judgment as final and appealable on March 22, 1993. This timely appeal followed.

## II

■ The Adamses maintain that Barclays did not meet its burden of proving hindrance, delay or fraud by clear and convincing evidence, and assert that the bankruptcy court thus erred in denying them a general discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(2)(B). Section 727, in relevant part, provides that:

(a) The Court shall grant the debtor a discharge, unless—

.    .    .    .    .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate

charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; ...

A bankruptcy court's finding of hindrance, delay, or fraud is a factual finding, which we review for clear error. *Longo v. McLaren (In re McLaren),* 3 F.3d 958, 960–61 (6th Cir.1993).

Here, the parties disagree with respect to the appropriate burden of proof under Section 727. The Adamses maintain that Barclays bears the burden of proving a Section 727 exception by clear and convincing evidence, while Barclays asserts that it is only required to prove such an exception by a preponderance of the evidence. The bankruptcy court did not explicitly apply either of these standards in finding that "Barclays has met the burden of conclusively showing that the Adamses actually intended to hinder or delay the collection of its debt by [their] pre and post-petition transfers."[1]

In *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991), the Supreme Court held that a creditor must prove exceptions to dischargeability for individual debts under 11 U.S.C. § 523(a), including the exception for fraud, by a preponderance of the evidence. The Supreme Court reasoned as follows:

Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless "particularly important individual interests or rights are at stake." We have previously held that a debtor has no constitutional or "fundamental" right to a discharge in bankruptcy....

We are unpersuaded by the argument that the clear-and-convincing standard is required to effectuate the "fresh start" policy of the Bankruptcy Code ... [T]he Act limits the opportunity for a completely unencumbered new beginning to the "honest but unfortunate debtor."

---

1. The bankruptcy court relied on two prior bankruptcy court decisions involving fraud for the proposition that a creditor must "conclusively show" hindrance or delay under Section 727(a)(2). *See In re Cycle Accounting Services,* 43 B.R. 264 (Bankr.E.D.Tenn.1984); *In re Porter,* 37 B.R. 56 (Bankr.E.D.Va.1984). Interestingly enough, neither case appears to require a conclusive showing by the creditor. Instead, both hold that a creditor must make out a *prima facie* case of actual fraud, at which point the burden shifts to the debtor to come forth with a reasonable explanation, based on the facts and circum-

stances of the case, as to why there was no fraud. *Cycle Accounting Services,* 43 B.R. at 271; *Porter,* 37 B.R. at 63–64. In fact, the only mention of the word "conclusive" appears in *Porter:* "If such fraudulent intent is thus established *prima facie,* it must be regarded as conclusively established unless rebutted by facts and circumstances which are proven." *Porter,* 37 B.R. at 63–64. The district court assumed, without analysis, that the bankruptcy court actually applied a "preponderance of the evidence" standard to Section 727. Based upon our reading of the cases relied upon by the bankruptcy court, we agree with the district court's conclusion.

*Id.* at 286–87, 111 S.Ct. at 659 (citations omitted). The Court's ruling in *Grogan* has retroactive effect, and thus we must consider whether its rationale is applicable to the present case. *In re Luce,* 960 F.2d 1277, 1281 (5th Cir.1992).

The Sixth Circuit has not spoken regarding the appropriate burden of proof for a creditor under Section 727. Applying the *Grogan* rationale, three other circuits have held that a creditor must meet its burden of proof under Section 727 by only a preponderance of the evidence. *See Farouki v. Emirates Bank Int'l,* 14 F.3d 244, 250 n. 17 (4th Cir.1994); *In re Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992); *In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991). We believe that the Supreme Court's reasoning in *Grogan* is equally applicable to Sections 523(a) and 727 of the Bankruptcy Code. Accordingly, we join our sister circuits in holding that the exceptions to dischargeability under Section 727, including the exception for fraud, require proof by a preponderance of the evidence.

▮▮▮ Here, the bankruptcy court found that the Adamses transferred collected accounts receivable into the Adams Plywood operating account, used post-petition cash collateral, and made post-petition transfers of cash collateral, all without authorization. After carefully reviewing the record, we are convinced that these findings are not clearly erroneous. The bankruptcy court further found, based on the above events, that Barclays conclusively proved an intent to hinder or delay its collection of the Adamses' debt under Sections 727(a)(2)(A) and 727(a)(2)(B) of the Bankruptcy Code. We observe, in this regard, that the bankruptcy and district courts correctly characterized the Adams

2. Section 727(a)(7) of the Bankruptcy Code, 11 U.S.C. § 727(a)(7), provides as follows:
    **(a)** The Court shall grant the debtor a discharge, unless—
        (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider; ...
    The term "insider" is defined in 11 U.S.C. § 101(31)(A)(iv):

Plywood accounts receivables as "property of the debtor," under Section 727(a), because Edsel Adams controlled Adams Plywood.[2] The bankruptcy court's finding of intentional delay or hindrance under this section is amply supported by the evidence, and we affirm the denial of discharge on those grounds.

## III

▮▮▮ The Adamses also contend that the bankruptcy court erred by applying a statutory presumption in finding Barclays' inventory sale to be commercially reasonable. The security agreement between the parties expressly provided that it was to be governed by North Carolina law, which establishes a conclusive presumption of commercial reasonableness for a sale of collateral if there has been substantial compliance with North Carolina General Statute Sections 25–9–601 through 25–9–607. The relevant parts of these statutory sections provide as follows:

> § 25–9–601—Disposition of collateral by public proceedings ... may be made in accordance with the provisions of this part. The provisions of this part are not mandatory ..., but any disposition of the collateral by public sale wherein the secured party has substantially complied with the procedures provided in this part shall conclusively be deemed to be commercially reasonable in all aspects.

> § 25–9–602—The notice of sale shall substantially:
>
> (a) Refer to the security agreement pursuant to which the sale is held;
>
> (b) Designate the date, hour, and place of sale ...;

**(31)** "insider" includes—
    **(A)** if the debtor is an individual—

. . . . .

    **(iv)** corporation of which the debtor is a director, officer, or person in control.
Edsel Adams wholly owned and controlled Adams Plywood. Adams Plywood thus qualifies as an insider, and the bankruptcy court was correct in considering the Adams Plywood accounts receivables to be property of the Adamses under Section 727(a)(2), by incorporation through Section 727(a)(7).

(c) Describe personal property to be sold substantially as it is described in the security agreement . . . ; and

(d) State the terms of the sale provided by the security agreement. . . .

§ 25–9–603—

(1) In each public sale conducted hereunder, the notice of sale shall be posted on a bulletin board provided for the posting of such legal notices, in the courthouse, in the county in which the sale is to be held, for at least five days immediately preceding the sale.

(2) In addition to the posting of notice . . . the secured party . . . shall, at least five days before the date of sale, mail a copy of the notice of sale to each debtor obligated under the security agreement.

N.C.Gen.Stat. §§ 25–9–601, 25–9–602, and 25–9–603. The bankruptcy court's finding of commercial reasonableness is a factual finding, and, as stated previously, we reverse such findings only if they are clearly erroneous. *McLaren,* 3 F.3d at 960–61.

In support of their contention that Barclays' inventory sale was commercially unreasonable, the Adamses present a veritable laundry list of nineteen separate allegations. Insofar as we are able to determine, only two of these allegations are related to the statutory requirements set forth above for a conclusive presumption of commercial reasonableness. The remainder of the allegations involve factors that, if established, would be relevant to an independent analysis of reasonableness, assuming that the statutory presumption did not apply.

The two "threshold" assertions made by the Adamses are that the notice of sale was not posted in timely fashion in the courthouse, and that the notice of sale described the sale site as that of Adams Plywood, while listing the address of Magic City Plywood. With respect to the first assertion, the record shows that Herbert Falk, Jr., an attorney for Barclays, testified that he caused the notice of public sale to be posted on November 20, 1984, in the Jefferson County courthouse in Birmingham, Alabama. This testimony was unrefuted. Section 25–9–603(1) requires that the notice be posted at least five days prior to the sale; here, the notice was posted eight

days prior to the sale, which took place on November 28.

With respect to the second assertion, the notice did describe the location of the sale as "the former place of business of the Debtor [Adams Plywood, Inc.]," and gave the street address of Magic City Plywood without naming that entity. The notice of sale, however, also mentioned that the collateral was then "located at two former places of business of the Debtor in Abbeville, Alabama, and one place of business in Birmingham, Alabama." The notice gave the correct street address of the sale, and, read as a whole, also stated that Barclays considered Adams Plywood to have more than one place of business. In this context, even a person who was familiar with Adams Plywood and Magic City Plywood as two separate entities would have understood, after reading the notice, that the juxtaposed references to Adams Plywood's "place of business" and the street address were not mutually exclusive descriptions. We conclude, based on the foregoing analysis, that the bankruptcy court did not clearly err in finding that Barclays had substantially complied with the statutory requirements for a conclusive presumption of commercial reasonableness. As the statutory presumption was properly established, the bankruptcy court correctly refused to consider the remainder of the Adamses' nineteen allegations. Thus, the bankruptcy court did not clearly err in finding that Barclays' inventory sale was commercially reasonable.

## IV

The Adamses argue, finally, that the bankruptcy judge should have recused himself, pursuant to 28 U.S.C. § 455, because his impartiality might reasonably have been questioned by an objective observer. Before the trial in the present case began, the Adamses filed a complaint against Philip Shanks and Ronald Riggs, their original bankruptcy counsel, with the Board of Professional Responsibility of the Tennessee Supreme Court. The complaint alleged that Shanks had touched, intimidated, or otherwise harmed Mrs. Adams during a hearing in the Barclays matter before Judge William B.

Leffler, the bankruptcy judge, on September 12, 1985. The complaint further alleged that both Riggs and Shanks had "sold out" in the bankruptcy proceeding and conspired to deprive the Adamses of their rights under the Bankruptcy Code.

After trial, the Adamses discovered that Judge Leffler had executed two affidavits, on behalf of Shanks and Riggs, for the Board on November 25, 1985, and October 28, 1986. In the first affidavit, Judge Leffler stated that he did not personally observe any conduct by Shanks during the hearing such as that alleged, that he did not believe that such conduct could have occurred without his being aware of it, and that Shanks had consistently conducted himself in an honorable manner before the bankruptcy court. In the second affidavit, Judge Leffler stated that he had seen no evidence of a "sell-out," conspiracy, or other wrongdoing by either Shanks or Riggs, and further stated that both men had always conducted themselves in an honorable manner before the court.

The Adamses maintain that a reasonable person, knowing of these affidavits, would have questioned Judge Leffler's impartiality, and that recusal under 28 U.S.C. § 455(a) was therefore mandatory. They further contend that Judge Leffler had a personal, extrajudicial bias or prejudice against them, requiring recusal under either 28 U.S.C. § 455(a) or (b)(1). Section 455 states, in pertinent part, that:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

28 U.S.C. § 455. Barclays, relying on *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), responds that the affidavits were neutral in tone, that they did not contain any material acquired by Judge Leffler from an extrajudicial source, and that recusal was thus unwarranted. In *Grinnell*, the Supreme Court held that recu-

sal is inappropriate under Section 455(b) unless the judge's alleged bias stems from an extrajudicial source. *Grinnell*, 384 U.S. at 583, 86 S.Ct. at 1710.

■ The Supreme Court recently decided that the "extrajudicial source" analysis articulated in *Grinnell* applies to motions for recusal under Section 455(a) as well as Section 455(b). *Liteky v. United States*, — U.S. —, —, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994). The Adamses contend that an objective appearance of impartiality, standing alone, is enough to require recusal under section 455(a). This contention is meritless given the additional, extrajudicial source analysis required by *Liteky*. As the Supreme Court explained in *Liteky*, — U.S. at —, 114 S.Ct. at 1157:

[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

We review a trial judge's recusal decision under this standard for an abuse of discretion. *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir.1990); *cert. denied*, — U.S. —, 114 S.Ct. 126, 126 L.Ed.2d 90 (1993).

Here, the opinions expressed in Judge Leffler's affidavits were formed on the basis of events occurring in the course of the current proceedings, as well as prior proceedings involving the Adamses' original bankruptcy counsel. The affidavits were appropriately restrained in tone, were confined to the judge's personal observations of counsels' courtroom behavior, and were made in the context of a state bar disciplinary proceeding. Moreover, the affidavits do not display deep-seated favoritism towards Barclays, or antagonism towards the Adamses, in the slightest degree. Accordingly, we conclude that Judge Leffler did not abuse his discretion, under either 28 U.S.C. § 455(a) or (b)(1), in denying the Adamses' motion for recusal and a new trial.

**V**

For the foregoing reasons, the judgment of the district court is affirmed.