In re Anthony J. LOMBARDI, Debtor.

**Barbara A. Sweeney, et al., Plaintiffs,**

**v.**

**Anthony J. Lombardi, Defendant.**

**Bankruptcy No. 99–58638.**
**Adversary No. 99–0416.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

June 18, 2001.

Russell E. Carnahan, Robert R. Byard, Hunter, Carnahan & Shoub, Columbus, OH, for plaintiffs.

Anthony J. Lombardi, Columbus, OH, defendant/debtor, Office of the U.S. Trustee, Columbus, OH.

### OPINION AND ORDER ON COMPLAINT OBJECTING TO DISCHARGE OR TO DETERMINE DISCHARGEABILITY OF DEBT

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court on the complaint of plaintiffs Barbara A. Sweeney and Randall W. Sweeney objecting to the discharge of debtor Anthony J. Lombardi pursuant to 11 U.S.C. § 727(a) and for a determination that the debt owing to them by Lombardi is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (4), or (6). The matter was tried to the Court on May 8, 2001.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of Reference entered in this district. This is a core matter which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(I) and (J).

The Sweeneys purchased real estate located at 1047 City Park (the "German Village property") in 1994 or 1995. At the time of their purchase, the German Village property was a 3–unit rental property, but the Sweeneys intended to renovate it as their residence after their children moved out. In 1996, they gave notice to the tenants to vacate the premises by summer 1996.

Mrs. Sweeney had an architect draw up plans for the renovation. The architect estimated the cost of the renovation to be $190,000. Mrs. Sweeney decided to look into costs herself, but got cold feet. The architect then recommended she meet with the defendant, Anthony Lombardi.

Defendant Lombardi was in the car business for 30 years and built some houses during the 1970's. He worked as a carpenter for Ryan Homes for one year, but had no other home construction or remodeling experience. Around 1990, he decided to enter the renovation business. He would buy and renovate properties in German Village and then sell them for a profit. In all, he renovated some thirty properties in German Village. He did some minor work, but generally contracted out most of the projects. His wife's corporation, TGL Enterprises, Inc. ("TGL") was involved in joint ventures in nearly all of the projects. Cheryl Lombardi was the only shareholder or officer of TGL. TGL ceased being active around 1997.

In addition to the renovation projects, defendant Lombardi also entered joint ventures with JBM Leasing & Rental ("JBM"). He would find and purchase automobiles, and then JBM would place title to the vehicles in its name for resale. Approximately 50 cars were sold in this way. For each sale, JBM received a $100 fee. Defendant Lombardi last sold a car in 1998.

Mrs. Sweeney, after meeting with defendant Lombardi, initially hired him to do the demolition work for which she made a down payment of $2,000. After learning of his renovation work in German Village, however, she subsequently discussed his oversight of the entire project. Mrs. Sweeney already had bids from her own subcontractors and defendant Lombardi agreed to oversee their work for a 25% fee. These subcontractors, however, would no longer do the work at the agreed-upon price because the project had changed.

Defendant Lombardi then lined up his own subcontractors and informed Mrs. Sweeney that he could do the job for $140,-000–$150,000 which would include a 20%

fee for him. He estimated that the project could be completed within 10–12 weeks because it was the slow season for residential construction. Based on these representations, Mrs. Sweeney agreed to hire defendant Lombardi as a general contractor for the project, but there was never a written agreement. Defendant Lombardi disputed that he ever acted as the general contractor for the renovation of the German Village property.

Defendant Lombardi began his post-demolition work on the project around November 3, 1996. He was to purchase the materials needed with his contractor discount and would be reimbursed by the Sweeneys along with his 20% fee. Defendant Lombardi produced handwritten materials costs to Mrs. Sweeney who then wrote out checks to cover the costs of the materials. Defendant Lombardi similarly wrote out labor costs on a subcontractor basis for which he also received payment from the Sweeneys. Many of the handwritten costs are included in plaintiffs' exhibit 13. Copies of the checks Mrs. Sweeney wrote to defendant Lombardi make up plaintiffs' exhibit 16.

In late January 1997, Mrs. Sweeney became concerned about the costs. She took copies of the plans to 84 Lumber and discovered that the amount for which she was billed by defendant Lombardi was way over what the actual costs should have been. When she confronted defendant Lombardi about this discrepancy, he assured her she was mistaken and that she would be receiving a $10,200 credit for overcharges.

The project encountered numerous delays. In early February 1997, the plans mysteriously disappeared, and it took 3–4 weeks to recreate them and to obtain the necessary permits. On April 28, 1997, Mr. Sweeney faxed plaintiffs' exhibit 4 to defendant Lombardi. This exhibit contained

the various tasks which comprised the project and had blanks for their completion dates to be filled in by defendant Lombardi. When defendant Lombardi returned the document to the Sweeneys with the dates filled in, he estimated an overall completion date of May 25, 1997.

The relationship between the Sweeneys and defendant Lombardi continued to deteriorate. After the April 28, 1997 fax, the Sweeneys made only the payment to defendant Lombardi on June 6, 1997 for $1,962. When they refused to advance further sums, he walked off the job on or about June 20, 1997.

The Sweeneys discovered that despite their payments to defendant Lombardi, many of the subcontractors and materialmen had not been paid to the extent of $4,749.02. They were actually sued by Lumberjacks. They also found out that the fireplace for which they had paid had been installed in another house on City Park in which Mrs. Lombardi had an ownership interest.

The Sweeneys had George Coleman evaluate what had been done and what needed to be done to complete the project. Ed Williams subsequently participated in finishing the project. The cost of completing the renovation after defendant Lombardi walked off was $59,180. Even with this cost, the Sweeneys gave up many of the original specifications and agreed to an overall lower level of construction.

In addition to the fireplace, there were other items for which the Sweeneys paid defendant Lombardi but which never made their way into the German Village property. The Sweeneys established that the total cost of such materials was $16,923.18.

The Sweeneys also proved damages arising from other work that was paid for, but never completed by defendant Lombardi, and for work that was not per-formed to specifications. These amounts were $12,916.46 and $5,490, respectively. The Sweeneys further contend that for all of these amounts that defendant Lombardi was not entitled to his 20% fee.

The Sweeneys sued defendant Lombardi, Cheryl Lombardi, and TGL in the Franklin County Common Pleas Court for damages. Defendant Lombardi subsequently filed a petition for relief under chapter 7 of the Bankruptcy Code on September 23, 1999. As a result, the state court action has been stayed.

### § 523(a)(2)(A)

■■■ In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove each of the following elements by a preponderance of the evidence:

1. the debtor obtained money through a material misrepresentation which, at the time, the debtor knew was false or made with gross recklessness as to its truth;

2. the debtor intended to deceive the creditor;

3. the creditor justifiably relied on the false representation; and

4. its reliance was the proximate cause of loss.

*Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir.), *cert. denied,* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). This exception to dischargeability, as with any other, must be strictly construed against the creditor. *Id.* at 281.

With respect to the first element, the debtor represented to Mrs. Sweeney that he could perform the contract for $140,000 to $150,000 and that the project could be completed within 10–12 weeks. There was no evidence, however, that the debtor knew these representations were false at the time he made them or that he made

them with gross recklessness as to their truth.

The debtor also represented to Mrs. Sweeney on each occasion before she wrote him a check that subcontractors had performed services in connection with the renovation of the German Village property. Although it turned out that the debtor failed to pay certain subcontractors, there was no evidence that the moneys he requested from Mrs. Sweeney were for work not performed. Therefore, these representations were not false.

Lastly, the debtor made a representation to Mrs. Sweeney that he could purchase materials at a substantial discount. He also represented that these costs for which he sought reimbursement from the Sweeneys were for materials to be used in the German Village property. The evidence established that in regard to the lumber, one or both of these representations were false. The evidence further established that the fireplace and certain other materials which the Sweeneys paid for were never used in their German Village residence. Accordingly, the debtor's representations that these materials were to be used in the renovation project were false.

The Court finds that the debtor intended to deceive Mrs. Sweeney and her husband regarding the materials and their cost when he made these representations. Moreover, the Sweeneys justifiably relied on these representations. As the result of their reliance, the Sweeneys paid the debtor money to which he was not entitled under their agreement.

The Sweeneys proved that the money which they either overpaid the debtor for materials or paid for materials never received was $16,923.18. Adding in the 20% fee the debtor charged them in connection with their materials, the total damages suffered by the Sweeneys were $20,307.82.

The Court concludes that this amount is nondischargeable under § 523(a)(3)(A).

## § 523(a)(4)

■ Title 11, United States Code, Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." In order to satisfy the necessary fiduciary relationship, the debtor must have held funds in trust for a third party. *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). Because the Sweeneys did not prove the existence of an express trust, their claim under § 523(a)(4) must fail.

## § 523(a)(6)

■ Section 523(a)(6) of the Bankruptcy Code provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. This exception is limited to "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). A debtor does not commit a "willful or malicious injury" under § 523(a)(6) unless he desires to cause the consequences of his act or believes that those consequences are substantially certain to result. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).

■ In this case, the plaintiffs apparently based their § 523(a)(6) claim on the debtor's alleged conversion of their property. An act of conversion may constitute willful and malicious injury depending on whether or not the debtor intended to cause the harm or was substantially certain that such harm would occur. *Howard v. McWeeney*, 255 B.R. 3, 5 (Bankr. S.D.Ohio 2000).

The most readily identifiable property alleged to have been converted by the debtor was a fireplace which was to have been installed in the plaintiffs' German Village property. The evidence established that the plaintiff had selected and paid for this fireplace, but that the debtor installed the fireplace in another residence in which he had an interest. The evidence further established that they were unable to obtain a fireplace with the same dimensions. Because the plans for the remodeling of the German Village property did not permit a fireplace of a different size, the plaintiffs had to forego the fireplace.

The evidence did not, however, show that the debtor knew or had any reason to believe that the same model fireplace would not be available for installation at a later date in the plaintiffs' German Village property. Rather, the debtor's testimony established that at the time he caused the fireplace to be installed in the other residence, remodeling work at the German Village property remained to be done before the fireplace could be installed.

Based on the testimony presented, the Court does not find that the debtor's conversion rose to the level of "willful and malicious injury" required by 11 U.S.C. § 523(a)(6).

### 11 U.S.C. § 727

The Sweeneys have alleged several claims under subsection (a) of this statute which, if they prevail, would bar the debtor's discharge. These claims include allegations regarding the debtor's fraudulent transfer or concealment of property, failure to keep or preserve books or records, false oaths, withholding documents and records from an officer of the estate, and failure to explain loss of assets or insolvency. To prevail on any of these claims, the Sweeneys must establish each of the required elements by a preponderance of the evidence. *Barclays/American Business Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 394 (6th Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 903, 130 L.Ed.2d 786 (1995); *see also* Bankruptcy Rule 4005.

### § 727(a)(2)

The elements to be established under this provision include:

1. that the act complained of was done at a time subsequent to one year prior to the petition date;
2. that the debtor had actual intent to hinder, delay or defraud a creditor;
3. that the debtor committed, or caused to be committed, the act in question; and
4. that the act consisted of the transfer, removal, destruction or concealment of any of the debtor's property.

*Nate B. and Francis Spingold Foundation, Inc. v. Halperin (In re Halperin),* 215 B.R. 321, 328 (Bankr.E.D.N.Y.1997).

The only evidence adduced at trial was circumstantial in nature and involved transactions which occurred in 1997. Because the debtor did not file his bankruptcy petition until September 23, 1999, the Sweeneys have failed to establish the first element.

### § 727(a)(3)

To uphold their objection to the debtor's discharge under this provision, the Sweeneys must prove either that the debtor failed to keep adequate records or that he destroyed, mutilated, falsified or concealed such records. They must further prove that the failure or act made it impossible for them to ascertain the financial condition and material business transactions of the debtor.

This claim appears to revolve around checks written to the debtor from TGL's account at State Savings Bank during a

two-month period in 1997, which totaled some $900,000. Copies of these checks were included in Plaintiffs' Exhibit 2 which was admitted into evidence without objection. The only testimony concerning these transactions was the debtor's on cross-examination. He testified that many of the larger checks were made out to him so that he could purchase cashier's checks. He would take the cashier's checks to purchase Mercedes automobiles which he would then re-sell to Canadian customers. By using cashier's checks, if the automobile he sought to purchase was not on the lot, he could re-deposit the money in TGL's account immediately.

Although earlier in cross-examination, Mr. Sweeney's attorney delved into the question of record keeping concerning the debtor's purchase of vehicles and re-sale through JBM Leasing & Rental, he did not inquire about any records maintained by the debtor with respect to the purchase and sale of the Mercedes automobiles in 1997. As for the earlier transactions, the debtor testified that he would give JBM the original bill of sale and in return would receive no paperwork, only the re-sale price minus a $100 fee.

After considering the evidence adduced at trial, the Court concludes that the Sweeneys failed to make out a *prima facie* case under § 727(a)(3). Specifically, they failed to present evidence that the trustee or creditors of the estate were unable to ascertain the debtor's financial condition from his existing records. *See Wynn v. Wynn (In re Wynn)*, 205 B.R. 97, 101 (Bankr.N.D.Ohio 1997). In making this finding, the Court also considered the fact that the questioned transactions occurred two years prior to the debtor's bankruptcy filing.

### § 727(a)(4)(A)

In order to deny the debtor a discharge based on § 727(a)(4)(A), the Sweeneys must prove that:

1. the debtor made a statement under oath;

2. the statement was false;

3. the debtor knew the statement was false;

4. the debtor made the statement with fraudulent intent; and

5. the statement related materially to the bankruptcy case.

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir.2000).

The Sweeneys point to three statements made by the debtor on the face of his petition and on his statement of financial affairs. The first "statement" is a check-off on the debtor's petition which indicates that his debts were consumer, non-business. The petition itself, however, does not contain an oath; therefore, the Sweeneys did not establish the first element under § 727(a)(4)(A) with respect to this "statement." Moreover, they did not show that the debtor was even aware that this box was checked or that by checking the wrong box the debtor intended to deceive the trustee or his creditors. The bankruptcy schedules completed under oath by the debtor negate any fraudulent intent in not checking the box by listing numerous business debts.

The second statement concerns the debtor's answer to questions 16 and 17 of his statement of financial affairs. In answer to questions 16, the debtor listed "none" for the names and addresses of all businesses in which he was an officer, director, partner or managing executive of a corporation, partnership or sole proprietorship. Similarly, he answered "none" in response to question 17 which asked for the names and addresses of any bookkeepers or accountants who within six years preceding his bankruptcy filing kept any of the debtor's books or records.

The evidence established that, while the debtor's wife was sole shareholder of TGL, he, in fact, controlled the day-to-day business of the corporation and had the authority to sign his wife's name on checks issued by TGL. The Sweeneys contend that this control made the debtor, in effect, a managing executive of the corporation, and the debtor conceded as much on cross-examination. The debtor also testified that Harry Prince acted as the accountant for TGL and as his personal accountant.

The answers the debtor supplied on his statement of financial affairs were under oath. The answer to question 16, in particular, was incomplete, if not false. The Sweeneys, however, did not show that the debtor knew his answers to questions 16 and 17 were false or that he intended to deceive the trustee or his creditors by listing "none."

An inference can be made that because the debtor was neither an officer or director nor held any formal title in TGL that he was not being untruthful. The scheduling of TGL as a co-debtor for many of his business debts revealed that the debtor had a relationship with TGL and thereby tends to negate the possibility that he intended to deceive either the trustee or his creditors through his answers to questions 16 and 17.

The third and final allegedly false oath involves the debtor's claim in response to question 1 of his statement of financial affairs that his income for 1997 was approximately $12,000. The Sweeneys offered no proof that this answer was false other than the fact that the debtor had written checks to himself totaling $900,000 from TGL. Given the debtor's explanation for these checks under oath, the Court cannot find that any of this money represented actual income to the debtor. Therefore, the Sweeneys failed to prove that this statement was false.

## § 727(a)(4)(D)

Section 727(a)(4)(D) provides for denial of a discharge to a debtor who "knowingly and fraudulently, in or in connection with the case withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers relating to the debtor's property or financial affairs." The Sweeneys presented no evidence in support of this claim, and their complaint appears to rely solely on the fact that at the 341 meeting the trustee demanded that the debtor produce certain business and financial records by January 1, 2000. The trustee, however, acknowledged in his Special Report of No Distribution that the debtor provided numerous documents and testified at a 2004 exam. Without evidence that the debtor failed to hand over any particular records to the trustee, the Court cannot sustain the Sweeneys' objection to discharge under § 727(a)(4)(D).

## § 727(a)(5)

Section 727(a)(5) provides that the Court may deny a debtor a discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge, any loss of assets or deficiency of assets to meet the debtors' liabilities." Once again, the Sweeneys appear to be relying on the fact that the debtor wrote checks to himself totaling $900,000 from TGL's account in 1997. Given the debtor's unrebutted testimony, recounted earlier in this opinion, of the reason he wrote the checks and their disposition, there was no evidence that these funds were assets of the debtor. Therefore, the Sweeneys failed to establish a *prima facie* case of diminution of assets which the debtor was obligated to explain.

But even if the Sweeneys are deemed to have made out a *prima facie* case, the

857

Court finds that the debtor's unrebutted explanation is sufficient for the purposes of § 727(a)(5). Moreover, while of limited evidentiary value, the chapter 7 trustee investigated the receipt and distribution of the $900,000 and took no further action. *See* Trustee's Special Report of No Distribution.

### Conclusion

Based on the foregoing, judgment shall be entered in favor of the Sweeneys for the sum of $20,307.82. This debt shall not be discharged in the debtor's bankruptcy as provided by 11 U.S.C. § 523(a)(2)(A). The Sweeneys' remaining nondischargeability claims shall be dismissed and their objections to the debtor's discharge are **OVERRULED.** Judgment will be entered on a separate document.

**IT IS SO ORDERED.**

### *JUDGMENT ENTRY*

Judgment is hereby entered in favor of plaintiffs Barbara A. Sweeney and Randall W. Sweeney and against the defendant, Anthony J. Lombardi, for the sum of $20,307.82. This debt is determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Judgment on the plaintiffs' claims under § 523(a)(4), (a)(6) and § 727(a)(2), (a)(3), (a)(4)(A), (a)(4)(D), and (a)(5) is entered in favor of the defendant.

**IT IS SO ORDERED.**