In re Greyce M. HARWELL, Debtor.

Ohio Crime Victims Reparations
Fund, Plaintiff,

v.

Greyce M. Harwell, Defendant.

Bankruptcy No. 05–55156.
Adversary No. 05–5152.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Aug. 25, 2006.

Amy Kaufman, Columbus, OH, Counsel to Plaintiff.

Duane Doyle, Twinsburg, OH, Counsel to Defendant–Debtor.

## MEMORANDUM OPINION RE: OBJECTION TO DISCHARGEABILITY OF DEBT

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter comes before the Court on the complaint of the Ohio Crime Victims Reparations Fund ("plaintiff" or "OCVRF") objecting to the dischargeability of a claim pursuant to 11 U.S.C. § 523(a)(6) [docket # 1] and defendant-debtor's answer thereto [docket # 21]. The Court held a trial in this matter on July 10, 2006. Appearing at the trial were Amy Kaufman and Melanie Cornelius, counsel for plaintiff and Duane Doyle, counsel for defendant-debtor. During the trial, the parties presented evidence in the form of exhibits and in the form of testimony from (1) defendant-debtor; (2) Twinsburg Police Officer Jeffrey Hayes; (3) Twinsburg Police Detective April Blubaugh and (4) Peter Travostino, a friend of defendant-debtor.

This proceeding arises in a case referred to this Court by the Standing Order of Reference entered in this District on July 16, 1984. It is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I), over which this Court has jurisdiction pursuant to 28

U.S.C. § 1334. Based upon the trial record and the documents of record in this adversary proceeding and the main chapter 7 case, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

1. In October 2003 defendant-debtor and Paul Teague ("Teague") were romantically involved but did not live together.

2. On the evening of October 2, 2003, defendant-debtor went to Teague's house in Twinsburg, Ohio.

3. During that visit, defendant-debtor and Teague got into an argument which resulted in defendant-debtor inflicting a 1 to 1 ½ inch knife laceration on the inside of Teague's left wrist, an act which she maintains was the result of self defense.

4. Defendant-debtor remained with Teague until his son arrived and took him to Bedford Medical Center ("BMC"). An employee of BMC contacted the Twinsburg Police regarding the stabbing. Twinsburg Police Officer Jeffrey Hayes went to BMC and interviewed Teague.

5. On October 3, 2003 defendant-debtor was arrested at her Chagrin Falls home, transported to the Twinsburg jail and charged with felonious assault pursuant to Ohio Revised Code ("ORC") § 2903.11.

6. On February 3, 2004, defendant-debtor pled guilty to the lesser included offense of assault pursuant to ORC § 2903.13 and on February 9, 2004, the Summit County Court of Common Pleas entered judgment against her. Defendant-debtor maintains that she plead guilty on the advice of the public defender who represented her. This advice was

based, in part, on the fact that no jail time would be involved. That judgment sets forth the following:

THEREUPON, IT IS THE ORDER OF THIS COURT that any Summit County Jail sentence is hereby SUSPENDED and the Defendant placed on probation for a period of Two (2) years upon the following terms and conditions, to-wit:

1. That she report to the Adult Probation Department as directed and abide by the rules and regulations of said Department and/or the Adult Parole authority.

2. That she refrain from offensive conduct of every nature and obey all laws.

3. That she pay a $100.00 per month fee for services rendered by the Adult Probation Department; said monies to be paid to the Summit County Clerk of Courts County Safety Building, 53 University Avenue, Akron, Ohio 44308–1662.

4. That she is to repay the County of Summit the costs of attorney fees incurred in this case as directed by the Adult Probation Department.

5. That she enter into and successfully complete an Anger Management counseling program as directed by the Adult Probation Department.

6. That she pay the costs of this prosecution as directed by the Adult Probation Department; said monies to be paid to the Summit County Clerk of Courts, County

---

1. In her answer defendant-debtor sets forth a jury demand. During the April 19, 2006 pretrial conference the Court ordered counsel for defendant-debtor to file a brief in support of his client's jury demand. See April 21, 2006 Pre–Trial Order [docket # 25]. If a brief was not filed, the jury demand would be deemed withdrawn. Id. No support brief was ever filed.

Safety Building, 53 University Avenue, Akron, Ohio 44308–1662.

IT IS FURTHER ORDERED that the Summit County Clerk of Courts shall collect monies from the Defendant in the following order of priorities: (1) costs; (2) restitution, if applicable; (3) Adult Probation Department fees; (4) fines, if applicable.

*See* Joint Ex. B.

7. Pursuant to Chapter 2743 of the ORC, Teague applied for and ultimately received from the OCVRF approximately $50,000.00 in reparations for economic loss incurred as a result of the stabbing (collectively, the "Reparations"). The procedures used by the OCVRF in making such awards do not provide for any involvement by the individuals from whom the OCVRF may seek reimbursement or repayment.

## DISCUSSION

ORC § 2743.72(A) provides that "[t]he payment of an award of reparations ... creates a right of reimbursement, repayment, and subrogation in favor of the reparations fund from an individual who is convicted of the offense that is the basis of the award of reparations." On her Schedule F—Creditors Holding Unsecured Nonpriority Claims, defendant-debtor lists $9,513.43 as owing to the OCVRF and she does not indicate that such amount is contingent or disputed.

Notwithstanding that ORC § 2743.72(A) addresses three distinct legal methods through which the OCVRF can recoup the Reparations from defendant-debtor, plaintiff has never specifically set forth which of those three methods it is invoking as the basis of this adversary proceeding. The OCVRF's rights to reimbursement and repayment are direct actions against defendant-debtor which arose after the altercation with Teague. Other than this action for nondischargeability, the OCVRF has not sought to collect the Reparations from defendant-debtor, and defendant-debtor had no right to participate in the administrative procedure which awarded the Reparations to Teague. Accordingly, it would appear that this adversary proceeding can only proceed based upon plaintiff being subrogated to Teague's right to bring a state law tort action against defendant-debtor. *See Montgomery v. John Doe 26,* 141 Ohio App.3d 242, 750 N.E.2d 1149, 1152–53 (2000). Neither party addressed whether or not Teague has ever advanced such a tort action against defendant-debtor and defendant-debtor has never challenged plaintiff's standing to bring this action. *Cf. In re Hudnall,* 91 Ohio Misc.2d 115, 698 N.E.2d 113 (Ct.Cl.1995) (motorist's execution of complete release in settlement with drunk driver's insurer for injuries sustained in collision waived motorist's rights to seek reparations under Victim of Crime Program since release precluded Attorney General from exercising right of subrogation on behalf of reparations fund against other driver). *See also* ORC § 2743.72(F)-(I).

As a result of her altercation with Teague, defendant-debtor pled guilty to assault pursuant to ORC § 2903.13 which provides, in pertinent part, as follows:

**§ 2903.13 Assault.**

(A) No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn.

(B) No person shall recklessly cause serious physical harm to another or to another's unborn.

Plaintiff contends that defendant-debtor's guilty plea should constitute her admission in this Court of all the elements of ORC § 2901.13. Plaintiff further contends that the doctrine of collateral estoppel should bar defendant-debtor from raising self defense in any subsequent civil proceeding.

The doctrine of collateral estoppel applies to bankruptcy proceedings and can be invoked in a nondischargeability action to prevent the relitigation of issues already decided by a state court. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). When applying the collateral estoppel doctrine, the principles of the Full Faith and Credit Statute (28 U.S.C. § 1738) require a bankruptcy court to "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Rally Hill Productions, Inc. v. Bursack (In re Bursack)*, 65 F.3d 51, 53 (6th Cir. 1995), *citing Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). *See also Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317 (6th Cir.1997). Accordingly, this Court must look to Ohio substantive law to determine whether defendant-debtor's guilty plea and subsequent judgment should have any preclusive effect in this adversary proceeding.

Ohio law is clear that a guilty plea in a criminal prosecution constitutes a complete admission of a defendant's guilt in that criminal proceeding. *See* Ohio R. Crim. P. 11(B)(1); *State of Ohio ex rel. Stern v. Mascio*, 75 Ohio St.3d 422, 662 N.E.2d 370, 372 (1996). What effect that guilty plea would have in a subsequent civil proceeding is not, however, as clear especially given that the OCVRF was not a party to the criminal case.[2]

As the Ohio Supreme Court stated in *Broz v. Winland* (1994), 68 Ohio St.3d 521, 629 N.E.2d 395: "The main legal thread which runs throughout the determination of the applicability of res judicata, inclusive of the adjunct principle of collateral estoppel, is the necessity of a fair opportunity to fully litigate and to be 'heard' in the due process sense." ... The Ohio Supreme Court has also held that mutuality of parties is a prerequisite to collateral estoppel.... "[A]s a general principal, collateral estoppel operates only where all of the parties to the present proceeding were bound by the prior judgment.... A prior judgment estops a party, or a person in privity with him, from subsequently relitigating the identical issue raised in the prior action." ... We note that appellees were not parties to the criminal trial. More important, they would not have been bound by the prior judgment. Thus, had appellant been acquitted at his criminal trial, appellees would still have been free to bring their cause of action. While the Ohio Supreme Court has subsequently suggested that the strict mutuality of parties requirement may be relaxed in the interest of justice, ..., we see no reason to relax the requirement in this case....

Thus, the conviction may be admitted into evidence and accorded whatever

---

2. In preparation for a trial this Court requires parties to submit to (but not file with) the Court proposed findings of fact and conclusions of law addressing the issues presented in the case. The conclusions of law must include, at a minimum, citations to Supreme Court and Sixth Circuit case law, if any, that would be binding upon this Court. As to any non-bankruptcy issues that will be addressed, the conclusions of law must include citations to law from the applicable jurisdiction. *See* docket # 25 and # 29.

In its proposed findings of fact and conclusions of law the OCVRF simply states that defendant-debtor's guilty plea acts as an admission to the elements of ORC § 2903.13 without distinguishing between the plea's effect in the underlying criminal proceeding versus a subsequent civil proceeding and without supporting that statement with *any* legal citations. Counsel for the OCVRF also failed to address this issue during closing arguments at trial.

weight the factfinder deems appropriate. It does not, however, preclude additional litigation involving the facts and legal issues underlying the conviction. We recognize, of course, that the conviction will likely be very strong evidence in most instances. Nevertheless, the party against whom the evidence is admitted should have an opportunity to offer evidence rebutting the inference provided by the conviction. We acknowledge that this stance is somewhat contrary to the trend in federal courts. ... The authors of a leading treatise on federal practice write that federal courts now frequently allow private party plaintiffs in civil actions to use issue preclusion offensively against former criminal defendants....

This court is not prepared to follow the trend suggested by these authorities. We have reviewed the arguments carefully and find that the advantages gained by preclusion do not outweigh the risks inherent in allowing a criminal conviction to bind a defendant in a subsequent civil suit based upon the same conduct. Procedural and discovery differences between the criminal and civil forums coupled with the defendant's dilemma over whether to testify on his own behalf or present any defense at the criminal trial make preclusion in this instance a precarious and, we believe, unwise practice....

*Phillips v. Rayburn,* 113 Ohio App.3d 374, 680 N.E.2d 1279, 1283–84 (1996). *See also State of Ohio ex rel. Ferguson v. Court of Claims of Ohio, Victims of Crime Div.,* 98 Ohio St.3d 399, 786 N.E.2d 43, 48 (2003) ("[T]he qualitative differences between civil and criminal proceedings [including the differing standards of proof, rules of discovery, and rules of evidence] militate against giving criminal judgments preclusive effect in civil or quasi-civil litigation.") (citation omitted); *State of Ohio v.*

*Schwartz,* 137 Ohio St. 371, 30 N.E.2d 551, 552 (1940) ("It is the general rule that a judgment of conviction or acquittal in a criminal case cannot be used in a civil case as evidence of the facts or matters upon which such judgment is founded ...; and this is so even if the same questions of fact are in issue in both cases.").

 Based upon the foregoing and because plaintiff presented no evidence of or argument regarding whether it could somehow be deemed to be in privity with the prosecuting arm of the State of Ohio, the Court finds that defendant-debtor's guilty plea cannot be given preclusive effect in this dischargeability proceeding. Even if defendant-debtor's guilty plea was given some preclusive effect and deemed to be an admission to the elements of ORC § 2903.13, her judgment of conviction did not distinguish between subsections (A) and (B). Accordingly, it could only be found that defendant-debtor admitted to "knowingly" *or* "recklessly" causing physical harm to Teague.

 Pursuant to § 523(a)(6) of the Bankruptcy Code, a chapter 7 discharge will not discharge an individual debtor from any debt "for willful and malicious injury by debtor to another entity or to the property of another entity." *See* 11 U.S.C. § 523(a)(6). Plaintiff must prove all necessary elements of § 523(a)(6) by a preponderance of the evidence, *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Barclays/American Business Credit, Inc. v. Adams (In re Adams),* 31 F.3d 389, 394 (6th Cir.1994), and exceptions to discharge are to be strictly construed in debtor's favor. In determining whether plaintiff has proved the necessary elements of its case, the bankruptcy court, as trier of fact, must weigh conflicting facts, determine the credibility of witnesses and draw infer-

ences from the evidence presented. *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir.1993); FED. R. BANKR. P. 8013.

During trial, defendant-debtor did not dispute that she acted deliberately when she stabbed Teague. However, pursuant to the United States Supreme Court's decision in *Kawaauhau v. Geiger*, a debtor's conduct can be deemed "willful" for purposes of § 523(a)(6) only when the debtor intended both her conduct and the resulting consequences of that conduct. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). *See also Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir.1999) ("unless 'the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)"). Defendant-debtor contends that her actions were not "willful" because they were taken in self-defense and not with the intent to cause the resulting harm to Teague. In Ohio, the elements of self-defense are: (1) that the defendant was not at fault in creating the violent situation; (2) that the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Thomas*, 77 Ohio St.3d 323, 673 N.E.2d 1339, 1342 (1997).

To support its contention that defendant-debtor was not acting in self-defense when she stabbed Teague, the OCVRF elicited testimony from Officer Hayes and Detective Blubaugh. Aside from referencing the narrative section of the police report that he prepared (Joint Ex. A), Officer Hayes did not recount any additional information from his conversation with Teague. In his report, Officer Hayes recites only what Teague told him during their conversation at the hospital as well as a description of Teague's wound. At no time during his involvement with the case did Officer Hayes have an occasion to physically inspect or interrogate defendant-debtor.

Detective Blubaugh testified that she first met defendant-debtor when she arrived at her home to conduct the arrest. Detective Blubaugh also testified that she was present with defendant-debtor at the jail when defendant-debtor was required to change from her street clothes to a jail issued jumpsuit and that, when defendant-debtor disrobed, she observed no bruises or other physical abnormalities. Notwithstanding Detective Blubaugh's testimony, the portion of the police report prepared by Detective Sergeant Nash sets forth, in part, the following:

> On 10/03/03 at approx. 0845 hrs., Det. Sgt. Nash and Det. Blubaugh went ... to execute the arrest warrant on Greyce Harwell. With the assistance of the Chagrin Falls PD, Harwell was placed under arrest.
>
> During the transport, Harwell without being asked any questions or prompted in any way, voluntarily stated that she and Teague had gotten into an argument. She further stated the argument had become violent and Teague began to choke her in the kitchen. She said she grabbed a knife and cut Teague in self-defense. After Teague was cut, Harwell said she assisted Teague in bandaging the wound and applying a tourniquet. Teague then called his son and Harwell left the residence.
>
> Harwell stated when she was physically attacked, she suffered a bump on her head and some injured ribs. In booking, Det. Blubaugh checked Harwell for

such injuries and did see a bump on the head.

Joint Ex. A at pg. 5. When questioned during cross-examination about the discrepancy between her testimony and the police report regarding a bump of defendant-debtor's head, Detective Blubaugh stated simply that the police report was mistaken. On re-direct Detective Blubaugh again stated that she never saw any bruising on defendant-debtor.

Detective Blubaugh testified that she has been involved in numerous domestic relations assault cases during her 17 year career with the Twinsburg Police Department and that such matters are a common occurrence. There was no testimony during trial as to whether the incident between Teague and Harwell was somehow more memorable to her that the many other cases she has worked on. Detective Blubaugh also never explained why, almost three years later, she was so certain that she did not observe a bump on defendant-debtor's head but that, instead, the police report was mistaken. Detective Blubaugh also did not explain whether errors in police reports are a common occurrence and whether she took any action to correct the purported mistake.

Defendant-debtor testified that she and Teague got into a heated argument when she confronted him about his continued drug use. She also testified that the argument became violent after she swept the drug paraphernalia off the kitchen counter and onto the floor. According to defendant-debtor's recollection, it was at that time that Teague unexpectedly began chocking her from behind which caused her to fear for her life. Defendant-debtor claims that she stabbed Teague in the wrist only to get him to release his grip. Defendant-debtor also claims that once she inflicted the wound she was no longer fearful which is why she remained with Teague

until his son arrived to take him to the hospital. In addition to the fact that defendant-debtor's testimony appeared credible, it was consistent with Detective Blubaugh's portion of the police report.

While enroute to TPD Station, Greyce stated that she had stabbed Teague in self-defense as he was choking her. At this point, Det. Blubaugh interrupted Greyce and advised her of her miranda rights. Greyce stated she didn't care and wanted the police to know the truth. Greyce indicated she had been injured in the altercation with Tegague [sic], that she believed he had broken some of her ribs and that he was trying to strangle her with his hands. Greyce stated she managed to get hold of a kitchen knife and stab Teague in the arm which made him let go. Greyce stated Teague's son took him to the hospital and Greyce went home. Greyce stated she didn't want Teague to get in trouble so she didn't call the police. Det. Sgt. Nash asked if Greyce needed medical attention for her ribs and Greyce said no, that she's had broken ribs in the past and there is nothing the doctor can do for it.

Upon arrival at TPD Greyce was booked by Det. Blubaugh and Det. Sgt. Nash. Det. Blubaugh went into the restroom with Greyce who removed her shirt to show Det. Blubaugh her injured ribs. Det. Blubaugh observed no redress [sic], no bruising, no swelling or distortion in the area indicated by Greyce (left side below breast). Det. Blubaugh asked if there were any bruises or marks from the fight and Greyce said she didn't know. Det. Blubaugh looked at Greyce's arms and elgs [sic] and all around her neck but did not see any bruising, swelling, redness or any other signs of injury.... Greyce refused any

medical attention but continued to complain of pain in her rib cage.

Joint Ex. A at pg. 6.

The only two parties present during the altercation were defendant-debtor and Teague. Notwithstanding that the issue before this Court was Teague's tort rights against defendant-debtor, Teague was not called as a witness during trial. Some of Teague's statements to police were recorded in the police report. Not surprisingly, Teague's statements about the events leading up to the stabbing do not match defendant-debtor's description of those same events. Teague does, however, admit to physically assailing defendant-debtor during their argument.

> While Harwell was in the restroom, Teague went into the bedroom to lie down. Harwell finished in the restroom and returned to the living room continuing to talk to herself. Teague got out of bed to ask Harwell to join him and he saw her sitting on the couch looking for previously called numbers on his cell phone. Harwell again became angry and threw the cell phone at Teague, followed by a glass candle. Teague became angry and started yelling at Harwell to get out or he would call the cops. Harwell ran into the kitchen and grabbed two knives and came back out to the living room and told Teague that if he called the cops to take her out, she was going to take him out. Teague attempted to ease the tension by turning away and Harwell sat down. It is unknown by Teague if Harwell kept the knives when she sat down.

> Teague went into the kitchen and grabbed the trash can and began cleaning up the broken glass in the hallway. When he went to return the can to the kitchen, Harwell kicked him from her seated position. Teague stated he grabbed Harwell's legs and pulled her off the chair onto the floor, then pinned her down. After a short time, Teague got up and proceeded to get a vacuum to clean up the rest of the debris. After one pass down the hallway and one back, Harwell came at Teague with a steak knife over her head in her right hand. Teague attempted to block the stab with his left hand and sustained a cut on his wrist. . . .

> Teague stated that at no time did he strike Harwell or attempt to choke her. The only physical contact he admitted to was pulling our of the chair and pinning her to the floor.

Joint Ex. A at pg. 8.

Defendant-debtor also testified during trial that marks from the injuries she claims to have sustained from being chocked by Teague did show up until two days after the incident. That testimony was corroborated by the testimony of Peter Travostino who, although a close personal friend of defendant-debtor, also appeared credible to the Court. Mr. Travostino testified that two days after the incident he observed bruising on defendant-debtor's neck, arms and legs. Mr. Travostino also testified that, because of the bruising, he insisted defendant-debtor go to the emergency room and that, because she had no insurance, he paid the bill. Neither defendant-debtor nor Mr. Travostino testified regarding what medical attention she received nor was any evidence from that emergency room visit (such as a copy of the doctor's report or the bill for services) ever presented.

Aside from defendant-debtor's conviction for assault (which addresses both knowing and reckless conduct) and the self-serving statements of Teague in the police report, plaintiff did not present any evidence to contradict defendant-debtor's version of the events that lead up to Teag-

ue's injury. Because the Court credits defendant-debtor's testimony, it finds that defendant-debtor was acting to defend herself when she stabbed Teague.

## CONCLUSION

Based upon the foregoing, the Court finds that plaintiff has not proven by a preponderance of the evidence that defendant-debtor acted willfully (as that term was defined by the Supreme Court in *Kawaauhau v. Geiger*) or maliciously when she inflicted injury on Teague. Accordingly, any obligation of defendant-debtor to plaintiff as to the Reparations will not be excepted from defendant-debtor's chapter 7 discharge pursuant to 11 U.S.C. § 523(a)(6). A final judgment consistent with this Opinion will be entered separately.