In re Alabama Cheyenne **MORRISON** & Crystal Dannette Morrison, Debtors.

**Joseph S. Stephens, Plaintiff,**

v.

**Alabama Cheyenne Morrison, Defendant.**

Bankruptcy No. 09–14982.
Adversary No. 10–5041.

United States Bankruptcy Court, W.D. Tennessee, Eastern Division.

May 27, 2011.

---

R. Bradley Sigler, Jackson, TN, for Plaintiff.

Laura A. Keeton, Hollow Rock, TN, for Defendant/Debtor.

## MEMORANDUM OPINION RE: COMPLAINT OBJECTING TO DISCHARGEABILITY

G. HARVEY BOSWELL, Bankruptcy Judge.

The Court conducted a trial on the plaintiff's complaint objecting to dischargeability on April 4, 2011. FED. R. BANKR.P. 7001. This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(I) and J. The Court has reviewed the testimony from the hearing and the record as a whole. This memorandum opinion shall serve as the Court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052.

## Findings of Fact

The debtors in this case, Alabama Cheyenne Morrison and Crystal Dannette Morrison, (collectively "Debtors"), filed their chapter 7 petition for bankruptcy relief on December 4, 2009. On their Statement of Financial Affairs, under Item 4, "Suits and administrative proceedings, executions, garnishments, and attachments," the Debtors listed a pending civil lawsuit in Benton County Chancery Court styled "Joseph Samuel Stephens vs. Alabama Morrison."

The Debtors' disclosure of the Chancery Court lawsuit was incorrect in two ways. First, the lawsuit was pending in Carroll County Chancery Court, not Benton County. Secondly, although the Debtors listed the status as "pending" at the time of filing, the Chancery Court had actually entered a default judgment against Alabama Morrison, ("Morrison"), on November 19, 2009, in the amount of $64,300 plus pre-judgment interest of 10% per annum since December 3, 2007. The judgment was for breach of an August 2, 2006, construction contract.

The state court breach of contract action arose out of a construction contract Joseph Stephens, ("Stephens"), entered into with ABC Remodeling in Bruceton, Tennessee, in the summer of 2006. As owner and operator of ABC, Alabama Morrison, ("Morrison"), submitted a bid to Stephens on July 1, 2006, which Stephens accepted on August 2, 2006. Pursuant to the terms of the signed contract, ("Contract"), Morrison agreed to renovate Stephens' existing house at 27154 Highway 70 in Huntingdon, Tennessee, and to build an addition on to that house. As it was, Stephens's house was approximately 1600 square feet and the addition would add approximately 1600 more square feet. The renovations to the existing house included removing and replacing all flooring, drywall, and light fixtures, building a trayed ceiling in the living

room, removing the fireplace, scraping and refinishing the ceilings, removing the back porch and carport, moving the primary entrance for electrical service to the house, painting and trimming the house and remodeling all transitions for the addition. The agreed upon price for the remodel and addition was originally set at $88,500. The price included all labor, services, and materials with the exception of the cabinets, windows, trim, hardwood, tile, light fixtures, doors and bathroom fixtures. Pursuant to the parties' agreement, Stephens was to provide those supplies for the project.

The parties attached an "Estimated Schedule" to the contract which provided that the remodel and addition would begin on October 23, 2006, and be essentially completed by December 28, 2006.[1] At the time of entering into the Contract, Stephens's wife, Dana Daniels, ("Daniels"), was three months pregnant. In light of this, Stephens specifically asked Morrison if he would be able to complete the project prior to the baby's birth. Morrison assured him that the work would be finished and, as a result, Morrison prepared the expedited construction schedule.

Pursuant to the terms of the contract, the parties agreed that "[a]n Additional Charges sheet will be provided in the event any unforeseen changes need to be made. Both homeowner and contractor will need to sign off on these charges when they are made." (Trial Exhibit 1). At some point during the project,[2] the parties executed an "Additional Charges Sheet" which provided that Morrison would remove and replace 9 windows in the existing house, add insulation in the existing structure attic, extend the addition by 153

square feet, remove and replace the existing air conditioner, add a trayed ceiling to the master bedroom, change ceiling height in the existing kitchen and den to 9 feet, add 2 headers for oversized doors, change the roof shingles and add 2 porches and 2 dormers. Stephens agreed to pay Morrison an additional $40,010 for these changes, bringing the total cost to be paid under the Contract to $128,510.00.

Although the Contract called for essential completion by December 2006, the project took longer than anticipated. Because of this, Stephens made payments under the contract over a period of approximately 18 months. Stephens disbursed a total of $128,871 to Morrison during this time period:

| Date of Check | Amount |
|---|---|
| 6/27/06 | $5000 |
| 7/19/06 | $10,000 |
| 8/2/06 | $10,000 |
| 9/8/06 | $25,000 |
| 10/27/06 | $25,000 |
| 12/19/06 | $10,000 |
| 1/8/07 | $15,000 |
| 7/9/07 | $2,200 |
| 8/25/07 | $12,800 |
| 11/20/07 | $10,000 |
| 12/3/07 | $3,871 |

Stephens submitted copies of the cancelled checks for these payments as Trial Exhibit 3.

Despite the fact that Stephens had timely delivered all of the supplies he agreed to provide to the job site, Stephens testified that four months into the project Morrison had not started work on the Stephens' home. When Stephens confronted Morrison about this, Morrison stated that he had other jobs going on at that time, but

---

1. The "Estimate Contract" actually provides for "start punch list to finish" on December 28, 2006.

2. The parties submitted a copy of the "Additional Charges Sheet" as Trial Exhibit 2; however, this sheet is not dated and neither party testified as to when this agreement was entered into.

he assured Stephens that he would get to their job and finish it timely.

Albeit grossly behind schedule, Morrison eventually did begin work on Stephens' house. He did not, however, finish the project. The parties disagree as to the causes of the delay and the problems with completion of the project. According to the evidence presented at trial, including photos of the project submitted as collective exhibits 25 and 26, the testimony of Stephens and Morrison and the testimony from Carl Moore, a licensed contractor Stephens hired to complete the project, ("Moore"), the work Morrison completed included removing the roof and concrete pad on the existing carport, removing and replacing some of the brick on the exterior, removing all the windows in the existing house and replacing them with new ones, removing and replacing the existing air conditioner units, replacing most of the roof shingles, changing the ceiling height in the foyer, building the trayed ceilings in the living room and master bedroom, building the shell for the addition, installing windows in the addition, and beginning work on the 2 porches. Morrison did not, however, move the electrical service to a new location on the property nor did he complete the plumbing work inside the house. Although Morrison removed the old flooring, he did not install any new flooring in the house or addition. Morrison did install drywall in the addition, however, Moore testified that most of it had to be removed because the wiring and plumbing were not finished behind part of the drywall and the drywall on the exterior walls was put up without any insulation behind it.

Sometime in the early half of 2008, Stephens approached the district attorney's office about Morrison's failure to complete the project. Becky Keith, ("Keith"), an investigator from the Carroll County Sheriff's Department, was asked by the district attorney's office to investigate the matter. According to Stephens and Morrison, Keith contacted Morrison and informed him that he had 90 days to complete the project or the district attorney's office would pursue action against him. Morrison informed Keith that he intended to finish work on the project. He then sent Stephens an undated letter which reiterated his conversation with Keith:

... I would like to finish the work on your house. I had planned to go out of town for some personal reasons. I hope we can get through this in a civil manner. I'm wanting to finish this because it's the right thing to do.

(Trial Exhibit 29). Stephens testified that Morrison failed to complete any work on the project within the given 90–day time limit. Stephens then told Morrison not to return to the job. He hired Moore to complete the remodel and addition.

At the trial in this matter, Morrison conceded that he had not finished the project; however, he asserted that he had performed 80% of the work at the time Stephens asked him not to return to the job.[3] Despite this claim, Morrison agreed that the photos introduced into evidence by Stephens as collective exhibits 25 and 26 accurately reflected the status of the project as of the time he was fired by Stephens. When asked about the reason for the delays and failure to complete the

---

**3.** In preparation for trial, Morrison prepared a list of the work he claims to have completed on Stephens's project. Morrison placed a dollar value next to each task in the list which purportedly represented his estimation of the value of his work. Morrison did not, however, enter this list into evidence. Stephens's counsel objected to Morrison even testifying about the list because he asserted there was no documentation to support Morrison's estimates. The Court allowed Morrison to testify as to the tasks and values on the list; however, the Court agrees that there is nothing in the record to substantiate these claims.

job, Morrison testified that Stephens' wife, Dana Daniels, kept making changes about the location of cabinets, the height of the cabinets, the type of plumbing, the placement of walls, etc., and that she made it impossible for him to continue working on the project. Morrison also testified that Daniels refused to return his phone calls on numerous occasions thereby causing even more delays with the project. Although the Contract required any changes to be made in writing and signed off on by both parties, Morrison did not submit copies of any "Additional Charges Sheets" outside of the original one showing changes of $40,010.

Morrison's attorney called Daniels as a witness during the trial. During her testimony, Daniels asserted that Morrison's depiction of her was inaccurate. She testified that she never failed to respond to a request from Morrison. In fact, Daniels stated that she and her husband immediately responded to any requests from Morrison regarding the project because they were eager to have the house finished so that they could move in. Daniels also asserted that Morrison's claims that she kept making changes in the construction and design of the house were false, especially with regard to the kitchen cabinet height. Stephens and Daniels purchased all the cabinets within the first 3 months of the contract with Morrison. The cabinets had been at the house and waiting for installation since that time so Daniels disputed Morrison's claim that he was waiting on a decision from her regarding cabinet height. Daniels further testified that there were instances where a change was made, but only after Morrison suggested the change, i.e. moving the bathroom sinks to another wall for plumbing purposes, or after Morrison installed something incorrectly. Stephens supported this claim during his testimony as well.

After firing Morrison from the job, Stephens hired Moore to complete the work on the house. Moore began work on the house in March 2009. The total cost to finish the house was approximately $90,000. At the time Moore began work, there was no plumbing in the addition. The house had been partially wired, but it was not completed. The hardie board in the bathrooms had not been installed correctly. Moore had to install all new duct work in the remodel and the addition. Moore also had to rip down the drywall that had been installed and replace it because of the lack of plumbing and electrical behind the inside walls and the lack of insulation on the outside walls. Close to half of his time was spent correcting things Morrison did incorrectly. Moore testified that Stephens and Daniels were easy to work with and that they did not cause any delays in the progress of the work. In Moore's estimation, Morrison had only completed 30% of the work in the addition at the time he was let go by Stephens.

Although the parties disagree as to the amount and quality of the work done by Morrison in this case, they are in full agreement that Morrison's record keeping skills were, at the very best, lackluster. The only records Morrison produced at trial were copies of bank statements (trial exhibits 4–24) and copies of receipts for supplies used on Stephens's house (collective trial exhibit 27). He has no receipts for labor aside from some cancelled checks made out to individuals who Morrison claims worked on Stephens's house. He failed to produce any time cards for himself or his workers to substantiate these claims.

Morrison testified that he paid himself $15/hour for general labor on the job and agreed that working a normal 40 hour work week at this rate would result in a salary of $600/week. Morrison further

stated that he paid himself more when he was doing electrical or plumbing work, but he was unable to tell the Court what these rates were. He also failed to produce time records showing a breakdown of his labor on the job. Morrison also stated that he worked on 2 other jobs while working on Stephens's project, but he was unable to state with any particularity how much time he spent on those jobs as opposed to Stephens's project. When questioned about his lack of record keeping, Morrison testified that he had misplaced some of his records. He also stated that he stored a large number of records on his computer, but that the computer had crashed and he had been unable to gain access to any of those records since that time.

Trial Exhibit 27 consists of copies of receipts which show Morrison spent $37,867.84 on supplies for Stephens's house remodel and addition. Morrison also provided the Court with copies of his monthly bank statements from First Bank for May 2006–January 2008. With the exception of the statement dated July 17, 2007 (trial exhibit 18), all of the statements are for the "FirstClub Checking Account" ending in 2625 ("2625 Account").[4] The name on this account is shown as "Alabama C.D. Morrison." The July 17, 2007, statement (trial exhibit 18) shows a "Checking Account" number of * * *6163 ("6163 Account") and lists the owners of the account as "Alabama C.D. Morrison or Crystal D. Morrison." When asked about the difference between these two accounts, the Debtor stated that he primarily used the 2625 Account for work while the 6163 Account was primarily used by his wife for their personal bills. He also surmised that he used the 6163 Account in July because the 2625 Account was a "Checking Account in Collection" due to its overdraft status. The bank statements show that, on more than one occasion, Morrison transferred money from the 2625 Account into the 6163 Account and vice versa. On one occasion, Morrison also transferred money from the 2625 Account to a savings account at First Bank (Trial Exhibit 7, "$1,000 Transfer to Alabama Morriso/6502843 Savings Account").

Although he failed to produce any time sheets for his employees, Morrison testified that the following cancelled checks were all written for labor on Stephens's project:

| Checks written for labor on Stephens's job | | |
| --- | --- | --- |
| check number | payee | amount |
| 6109 | Glen Keith | $300 |
| 6138 | Dylan Casteel | $224 |
| 6166 | John Wallace | $95 |
| 6167 | Paul Beal | $196 |
| 6168 | Anthony Beal | $284.50 |
| 6169 | Richard Suggs | $370 |
| 6182 | Paul Beal | $40 |
| 6202 | John Wallace | $962 |
| 6208 | John Wallace | $837 |
| 6216 | John Wallace | $390 |
| 6217 | Jeff Parham | $124 |
| 6218 | Jeff Parham | $36 |
| 6219 | Luke Wallace | $65 |
| 6226 | John Wallace | $598 |
| 6228 | John Wallace | $559 |
| 6230 | Shawn Uhrick | $88 |
| 6238 | John Wallace | $410 |
| 6242 | Debbie Thompson | $700 |
| 6251 | Taylor Construction | $896.41 |
| 6268 | Jimmy Spears | $2000 |
| 6287 | Joe Humphreys | $300 |
| 6291 | John Wallace | $335 |

4. Trial Exhibit 17 is the July 5, 2007, statement for account 2625; however, instead of showing the type of account as "FirstClub Checking Account," it states that the type of account is "Checking Account in Collection." The statement shows a beginning balance of -$527.84 and an ending balance of -$701.75.

| | Checks written for labor on Stephens's job | |
|---|---|---|
| 6297 | Gary Batey | $245 |
| 6298 | Brandon Morrison | $50 |
| 6299 | Brandon Morrison | $25 |
| 6338 | Jimmy Spears | $2000 |
| 6348 | John Wallace | $422.50 |
| 6364 | John Wallace | $175 |
| 6380 | Jeff Lyell | $212 |
| 6389 | Manuel Paz | $250 |
| 6395 | Jeff Lyell | $274.50 |
| 6404 | Jeff Lyell | $288 |
| 6415 | Jeff Lyell | $147 |
| 6496 | Jimmy Spears | $850 |
| 6560 | Shane Morrison | $40 |
| 6572 | Manuel Paz | $100 |
| 6581 | Manuel Paz | $385 |
| 6610 | Manuel Paz | $200 |
| 6620 | Manuel Paz | $360 |
| 6630 | Manuel Paz | $245 |
| 6635 | Manuel Paz | $100 |
| 6644 | Manuel Paz | $210 |
| 6647 | Manuel Paz | $100 |
| 6648 | Manuel Paz | $400 |
| 6651 | Manuel Paz | $100 |
| 6675 | Manuel Paz | $530 |
| 6689 | Manuel Paz | $50 |
| 6695 | Manuel Paz | $250 |
| 6701 | Manuel Paz | $466.50 |
| 6707 | Manuel Paz | $100 |
| 6711 | Shawn Markham | $35 |
| 6718 | Manuel Paz | $400 |
| 6726 | Manuel Paz | $30 |
| 6732 | Manuel Paz | $100 |
| 6737 | Manuel Paz | $160 |
| 6754 | Manuel Paz | $500 |
| 6758 | Manuel Paz | $60 |
| 6777 | Manuel Paz | $323 |
| 6795 | Manuel Paz | $200 |
| unknown | Manuel Paz | $166.50 |

These checks total $20,359.91. Although Morrison failed to produce any records to substantiate his claim, Stephens did not dispute that any of these checks were for labor on his job. Morrison also testified that he paid some laborers in cash; however, he did not produce any records, such as time sheets or receipts, which support this allegation.

Between June 2006 and February 2008, Morrison deposited a total of $128,871 into his accounts at First Bank from Stephens. During this same time period, he also deposited slightly over $59,000.00 in his accounts at First Bank. When asked on direct examination what these deposits were for, Morrison was unable to recall their source, including a $12,000 deposit on August 10, 2007. Although some of the deposits included money Morrison transferred from the 6163 Account or from his First Bank savings account to the 2625 Account, the majority of the money came from deposits of cash or checks.

Also between June 2006 and February 2008, Morrison withdrew a total of $37,106.06 in cash from the 2625 Account. These withdrawals included $7,100 in cash withheld when deposits were made, $5,008.50 in ATM withdrawals, $2,485.00 in "Window Withdrawals," $7,434.62 in money transferred from the 2625 Account to Morrison's other accounts at First Bank, and $15,077.94 in checks written for "cash." Although Morrison testified that he used this cash to pay for some labor on Stephens' project, he failed to produce any records which evidenced this claim.

Although Morrison transferred money back and forth between at least 3 of his accounts at First Bank, he never provided a copy of the bank statement for the 65028423 savings account and he only provided a copy of the July 2007 statement for the 6163 Account. When questioned by the Court as to why he failed to produce all his bank records even though he was subpoenaed to do so, Morrison was unable to provide any explanation. In fact, with regard to the savings account referenced in Trial Exhibit 7, Morrison stated that he did not know what account that was.

Dissatisfied with his failure to explain his lack of production, counsel for Stephens also asked Morrison why he had not produced copies of bank statements for all 3 of his First Bank accounts, especially the 6163 Account. Morrison testified that "I never used her account or our account [the 6163 Account] to do anything with jobs or Joe Sam's [Stephens] job or anybody else's job for that matter, so I didn't retrieve those records." Despite this claim, Morrison admitted on direct examination that he deposited the July 9, 2007, $2,200 check from Stephens in the 6163 Account instead of the 2625 Account. When asked why he did this, Morrison stated that he could not remember the exact reason, but surmised that it was because the 2625 Account was overdrawn at that time and was in a collections status.

Although Morrison testified that he primarily used the 2625 Account for his business dealings, his bank records tell a slightly different story. It is true that the cash withdrawals and the checks written for labor all came out of the 2625 Account. It is also true that the 2625 Account appears to be the one Morrison used to purchase supplies for Stephens's project. However, a review of the statements shows that Morrison used this account for much more than just business. Morrison used this account to make numerous payments to pawn shops, Friedman's Jewelers, Citifinancial for one of his wife's debts, mortgage companies, Charter Communications, Verizon wireless and various medical providers. He wrote checks to his nieces and nephews for Christmas gifts and also wrote several checks to his children's day care center out of his "primarily for business" account. The charges to restaurants are almost too numerous to count.

Counsel for Stephens had Morrison go through each of the 20 bank statements submitted into evidence line-by-line and admit if the charge was for Stephens's project or for personal expenses. The bank statements are voluminous and it would be impossible for the Court to accurately add up all of the charges that were for goods and/or services that were not used on Stephens's job; however, it is possible to summarize some of the charges Morrison admitted were not for Stephens' job. The following chart only represents the charges made between June 30, 2006, and December 31, 2006. The bank records for the 2625 Account for all of 2007 and the first two months of 2008 reflect similar activity. The following chart does not include any cash withdrawals made during this time nor does it include the numerous charges to restaurants and gas stations. It also does not include any charges to Walmart since trial exhibit 27 demonstrates that some of the charges at Walmart were for supplies for Stephens's house. Morrison did admit, however, that some of the Walmart charges were unrelated to any business expenses.

| date of payment | amount | payee |
| --- | --- | --- |
| 7/7/06 | $234 | Citifinancial |
| 7/10/06 | $408.95 | Capital One Auto |
| 7/10/06 | $73.29 | Town of Bruceton-water bill |
| 7/10/06 | $84 | Overdraft fee |
| 7/11/06 | $56 | overdraft fee |
| 7/18/06 | $140 | overdraft fee |
| 7/20/06 | $28 | overdraft fee |
| 7/24/06 | $700 | Federal Home Loan Bank |
| 7/25/06 | $500 | Federal Home Loan Bank |
| 7/26/06 | $557.94 | Capital One Auto |
| 7/26/06 | $107 | Dell Financial-computer |
| 8/2/06 | $131.27 | Charter Communications |
| 8/4/06 | $56 | Dell Financial-computer |
| 8/4/06 | $31.95 | Goodys |
| 8/7/06 | $400 | Federal Home Bank |
| 8/7/06 | $350 | Federal Home Bank |

| Date | Amount | Description |
|---|---|---|
| 8/8/06 | $126.90 | Friedman's Jewelers |
| 8/8/06 | $400 | Centex Home Equity |
| 8/8/06 | $221 | McKenzie Medical |
| 8/8/06 | $234 | Citifinancial |
| 8/11/06 | $32.98 | Town of Bruceton-water bill |
| 8/11/06 | $480.60 | Verizon Wireless |
| 8/17/06 | $150 | Ann & Andy's Daycare |
| 8/25/06 | $519 | Pot O Gold pawn shop |
| 8/28/06 | $28 | overdraft fee |
| 8/29/06 | $112 | overdraft fee |
| 8/30/06 | $360 | Federal Home Loan Bank |
| 8/30/06 | $260 | Federal Home Loan Bank |
| 9/5/06 | $85 | Ann & Andy's Daycare |
| 9/5/06 | $200 | Crystal Morrison |
| 9/8/06 | $112 | overdraft fee |
| 9/11/06 | $121.72 | Town of Bruceton-water bill |
| 9/11/06 | $421.36 | Nationstar Mortgage |
| 9/14/06 | $468 | Citifinancial |
| 9/22/06 | $75 | Ann & Andy's Daycare |
| 9/22/06 | $720 | Federal Home Loan Bank |
| 9/22/06 | $520 | Federal Home Loan Bank |
| 10/2/06 | $98.30 | Pot O Gold Pawn Shop |
| 10/4/06 | $259 | Carroll County Clerk |
| 10/5/06 | $325.28 | Capital One Auto |
| 10/6/06 | $418.18 | Nationstar Mortgage |
| 10/10/06 | $100 | Jesse Thomas DDS |
| 10/10/06 | $75.88 | Town of Bruceton-water bill |
| 10/23/06 | $28.00 | Overdraft fee |
| 10/23/06 | $150 | Ann & Andy's Daycare |
| 10/24/06 | $45.07 | Overdraft item fee |
| 10/25/06 | $232.79 | Citifinancial |
| 10/25/06 | $253.80 | Friedman's Jewelers |
| 10/26/06 | $200 | No name on "pay to the order of" line |
| 10/27/06 | $167 | Dell Financial-computer |
| 11/1/06 | $149 | Travel Reservations |
| 11/1/06 | $66 | The Box Seat |
| 11/3/06 | $76 | Ann & Andy's Daycare |
| 11/6/06 | $325.28 | Capital One Auto |
| 11/7/06 | $523.86 | Federal Home Loan Bank |
| 11/7/06 | $322.75 | Federal Home Loan Bank |
| 11/9/06 | $410.68 | Nationstar Mortgage |
| 11/10/06 | $72.72 | Town of Bruceton-water bill |
| 11/16/06 | $75.00 | Ann & Andy's Daycare |
| 11/30/06 | $391.48 | Nationstar Mortgage |
| 12/5/06 | $309 | CEMC |
| 12/8/06 | $73.50 | Town of Bruceton-water bill |
| 12/10/06 | $1200 | Crystal Morrison |
| 12/19/06 | $582.89 | No name on "pay to the order of" line |
| 12/24/06 | $54 | Friedman's Jewelers |
| 12/24/06 | $50 | Friedman's Jewelers |
| 12/26/06 | $112 | Dell Financial |
| 12/29/06 | $162.06 | Charter Communications |

During his examination by Stephens's attorney, Morrison stated that he worked on other jobs during the entire time he worked on Stephens's project. He also testified that he did not purchase any supplies for these jobs out of his 2625 Account. All of the supplies on the other jobs were provided by the contracting party.

Adding up all of the deposits made into the 2625 Account between July 2006 and December 2007, Morrison deposited a total of $128,871.00 of Stephens's money into his accounts at First Bank. He has receipts for $37,867.84 in supplies for Stephens' job. His cancelled checks show payments for labor of $20,359.91. Stephens did not dispute the claim that all of these checks

were for labor on his home. Added together, Morrison has produced records evidencing $58,227.75 in business expenses for Stephens' job. He has no records which demonstrate how he spent the remaining $70,643.25. Since none of the checks written for labor were to himself, presumably, Morrison deducted his wages, $15/hour for general labor, from this amount.

Stephens filed the instant adversary proceeding against Morrison on February 16, 2010, in which Stephens asserted he was entitled to a non-dischargeable judgment against Morrison under 11 U.S.C. § 523(a)(2)(A), (a)(4) or (a)(6). On July 16, 2010, Stephens filed a motion to amend the complaint to include an additional cause of action under § 727(a)(3). That motion was granted on November 12, 2010.[5]

Prior to amendment of the complaint, Stephens filed a motion for summary judgment in which he asserted that the November 19, 2009, state court default judgment entitled him to judgment as a matter of law under § 523(a)(2), (4) and/or (6). The Court denied that motion on October 19, 2010, based on the fact that the Carroll County judgment was a very simple breach of contract default judgment. The judgment contained absolutely no findings of fact, let alone any findings that Morrison had committed fraud, misrepresentation, embezzlement, or any other type of behavior that could give rise to a judgment under § 523(a)(2)(A), (4) or (6). As such, the Court denied the motion.

### Conclusions of Law

**A. 11 U.S.C. § 727(a)(3)**

■■■■■ Section 727(a)(3) of the Bankruptcy Code provides that a bankruptcy court may deny a debtor a general discharge if

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case. . . .

11 U.S.C.A. § 727(a)(3). As with exceptions to discharge under 11 U.S.C. § 523, the grounds for denial of a general discharge under § 727(a) "should be construed strictly against the creditor and liberally in favor of the debtor [while recognizing] that a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Wazeter v. Michigan Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 226 (Bankr. W.D.Mich.1997) (internal quotations and citations omitted). As the bankruptcy court in *CM Temporary Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410 (Bankr.S.D.Ohio 2007) explained, the burden of proof under § 727(a)(3) is a shifting one:

The Plaintiff must establish a *prima facie* case showing the Debtor failed to keep adequate records. For purposes of § 727(a)(3), the Plaintiff is not entitled to perfect, or even necessarily complete, records. Instead, the Debtor must provide the Plaintiff "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." In determining the adequacy

---

**5.** Stephens's amendment to his complaint was filed after the bar date for objections to discharge; however, because his § 727(a)(3) claim arises out of the same conduct and transactions set out in the original complaint, the amendment relates back to the filing of the original complaint and is, therefore, timely. *Suntrust Bank v. Korfonta (In re Korfonta)*, 417 B.R. 707, 712 (Bankr.E.D.Va.2009).

of records, the court can consider the Debtor's education, business experience, sophistication, or any other relevant factor.

If the Plaintiff has established this *prima facie* case, the burden then shifts to the Debtor to explain why the failure to keep records, under the circumstances of the case, is justified. In considering an explanation, the court should consider both the Debtor's credibility and the reasonableness of the explanation, considering the debtor's sophistication and the materiality of the records. The requirement for keeping recorded information is not an unqualified one and complete disclosure is not always required, but instead it is a question of reasonableness under the circumstances. However, if disclosure cannot be made without the keeping of recorded information, the failure to supply the records is relevant to the policy underlying § 727(a)(3).

The ultimate burden of persuasion, of course, rests with the Plaintiff. The standard of proof for discharge objections under § 727(a) is by a preponderance of the evidence.

*Id.*, 375 B.R. at 415–16 (Bankr.S.D.Ohio 2007) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (6th Cir. BAP 1999)) (other citations omitted); *Astro Bldg. Supplies, Inc. v. Slavik*, 433 B.R. 651, 667 (E.D.Mich.2010). Because of the highly fact specific nature of the inquiry, the determination of whether a debtor has kept adequate records is to be made on a case-by-case basis. *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (6th Cir. BAP 1999). "The test is not whether the debtor could determine what was happening in his business, but [rather] whether a third-party such as a trustee or creditor could determine from the records what has happening in the debtor's business." *Bailey v. Ogden (In re Ogden)*, 251 B.R. 441, 1999 WL 282732 *13 (10th Cir. BAP 1999).

In cases similar to the one at bar in which the debtor's records were stored on a computer to which the debtor no longer had access, either because the computer crashed or was stolen, courts have found that the computer malfunction alone may not excuse the debtor from providing financial records. *Roberts v. Debusk (In re Debusk)*, 2008 WL 3904448 *6 (Bankr. E.D.Tenn.2008), *aff'd*, 2009 WL 1256891 (E.D.Tenn.2009); *Grau Contractors, Inc., v. Pierce (In re Pierce)*, 287 B.R. 457, 463 (Bankr.E.D.Mo.2002); *Shappell's, Inc., v. Perry (In re Perry)*, 252 B.R. 541, 548 (Bankr.M.D.Fla.2000). Additionally, when a debtor operates on a cash basis, courts have found that the debtor still has a duty to maintain invoices or receipts for the items purchased with cash. *Rupp v. Ibarra (In re Ibarra)*, 2010 WL 1388996 *2 (Bankr.D.Utah 2010); *Papco, Inc., v. Heal (In re Heal)*, 2009 WL 5214894, *7 (Bankr. N.D.Ala.2009). And, whereas here, "the debtor is engaged in running a business ..., the failure to keep or produce *any* records regarding those transactions may be treated as a violation of § 727(a)(3)." *Panda Herbal Int'l, Inc., v. Luby (In re Luby)*, 438 B.R. 817, 832 (Bankr.E.D.Pa. 2010) (emphasis added).

As stated supra, in order to state a prima facie case under § 727(a)(3), the plaintiff must "demonstrate that [the Debtor] ... failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (emphasis in original). Additionally, when analyzing a claim under § 727(a)(3), a court must "measure[] the quality of a debtor's records 'against the type of books and records kept by a reasonably prudent

debtor with the same occupation, financial structure, education and experience.'" *Wynn v. Wynn (In re Wynn)*, 205 B.R. 97, 101 (Bankr.N.D.Ohio 1997).

Turning to the case at bar, Morrison produced bank statements for June 2006 through February 2008 for the 2625 Account (the one he primarily used for business). With the exception of the July 9, 2007, $2,200 check, Morrison deposited all of Stephens' payments into the 2625 Account. Presumably, because he deposited the July 9, 2007, check into the 6163 Account, Morrison also provided a copy of the July 2007 statement for that account as trial exhibit 18. These statements show that all of Stephens's payments were deposited into Morrison's accounts. The statements also show every transaction into and out of those accounts for the covered months, including all the checks that were written, every point-of-sale debit card transaction and every deposit into the accounts. Morrison also provided copies of the receipts for materials he alleges he used on Stephens's job. Stephens did not object to these alleged expenses.

Although Morrison provided thorough copies of his bank statements for the 2625 Account during the relevant time period, he failed to produce several records. First, although he transferred money back and forth between the 2625 Account, the 6163 Account and his savings account at First Bank, Morrison failed to produce copies of the bank statements for the 6163 Account and the savings account for the entire June 2006 through February 2008 time period. He also failed to produce any type of records for the $37,106.06 in cash he withdrew from the 2625 Account between June 2006 and February 2008. Although he testified that he used some of this cash to pay laborers on Stephens's job and to purchase supplies, he has no receipts or time cards to substantiate these claims.

Although the facts in this case put Morrison on the cusp of a § 727(a)(3) denial of discharge, the Court finds that there are a few factors which tip the balance in Morrison's favor. First, Morrison did present all of the bank records for the 2625 Account during the relevant time period. Although Morrison failed to present some evidence regarding his cash withdrawals, any interested party can track the flow of Stephens's money into and out of Morrison's account. Second, the plaintiff did not present any evidence to the Court that Morrison failed to comply with the standard for record keeping for independent home improvement contractors similar in size to Morrison's business. The Court, therefore, is unable to ascertain if his records are inadequate or not within the meaning of § 727(a)(3). There was also no proof introduced as to Morrison's level of education or computer knowledge. There is nothing in the record which demonstrates Morrison was computer savvy enough to know that he should somehow back up the information on his computer or that his computer would be susceptible to a crash. In fact, Morrison testified that he attempted to recover the records on the computer, but he was unable to do so. Although the crash of a computer can be found to be an inadequate explanation for a lack of records, the debtors in those cases typically either run a computer based business or are more business savvy than Morrison appears to be.

Lastly, and most importantly, this adversary proceeding was brought by a creditor seeking to except his individual debt from discharge. In prosecuting the lawsuit, Stephens sought production of Morrison's records as they related to Stephens's job. There is nothing which indicates Stephens sought the production of all of Morrison's financial records for 2006 through 2008. In fact, Stephens did not even argue that Morrison's financial records made

it impossible to ascertain his financial condition as a whole. He alleged only that the records were spotty as it related to his job. And, while it is true that Morrison's records regarding the cash withdrawals from his business account and any records regarding the time Morrison spent on Stephens's job are non-existent, the Court finds that denying Morrison a discharge is not warranted in this case.

Although the Court concludes that Stephens is not entitled a judgment under 11 U.S.C. § 727(a)(3), Morrison is not out of the woods.

### B. 11 U.S.C. § 523(a)(6)

 Section 523(a)(6) of the Bankruptcy Code provides that

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6). A creditor seeking to have a debt declared non-dischargeable under this section must prove § 523(a)(6)'s elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Once a creditor establishes a prima facie case, the burden shifts to the debtor to present credible evidence that a defense to the liability exists. *Sears Roebuck & Co., v. Miller (In re Miller),* 70 B.R. 55, 56 (Bankr.S.D.Ohio 1987). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor "with the benefit of any doubt going to the debtor." *Manufacturer's Hanover Trust Co. v. Ward (In re Ward),* 857 F.2d 1082, 1083 (6th Cir.1988).

 Until 1999, the Sixth Circuit's standard for § 523(a)(6)'s "willful" requirement was rather lenient. As long as a debtor could be shown to have intentionally committed an act which led to an injury, he would be found to have acted "willfully" under § 523(a)(6), regardless of whether or not he actually intended the injury. *Perkins v. Scharffe,* 817 F.2d 392, 394 (6th Cir.1987). *Perkins* was overruled in 1998 by the U.S. Supreme Court case of *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). In *Geiger,* the Supreme Court held that only acts done with the intent to cause the actual injury will rise to the level of a "willful and malicious injury" as used in § 523(a)(6). *Id.* In light of the Supreme Court's ruling in *Geiger,* the Sixth Circuit amended its definition of "willful" as used in § 523(a)(6):

[W]e now hold that unless "the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it," he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 464 (6th Cir.1999).

 In addition to requiring a creditor to prove that a debtor acted willfully, § 523(a)(6) also requires the creditor to show that the debtor acted maliciously. 11 U.S.C. § 523(a)(6). "Under § 523(a)(6), a person is deemed to have acted maliciously when that person acts in conscious disregard of his duties or without just cause or excuse." *Gonzalez v. Moffitt (In re Moffitt),* 252 B.R. 916, 923 (6th Cir. BAP 2000) (citations omitted); *River View Land Co., Inc., v. Bucak (In re Bucak),* 278 B.R. 488, 493 (Bankr.W.D.Tenn.2002) (citations omitted) ("The definition of 'malicious,' for section 523(a)(6) purposes, is proven when a creditor shows that a debtor acted in conscious disregard of the rights of others, without just cause or excuse."). However, "[t]he conduct must be more culpable than

that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from … legal rights. [K]nowledge that legal rights are being violated is insufficient to establish malice." *Prime Fin'l. Servs. v. Brandenburg (In re Brandenburg)*, 2011 WL 830489, *9 (Bankr.E.D.Tenn.2011) (internal quotation marks and citations omitted).

As with § 523(a)(2)(A)'s requirement of establishing fraudulent intent, proving that a debtor acted willfully and maliciously under § 523(a)(6) can be difficult. Debtors will rarely, if ever, admit to acting in a willful or malicious manner. As a result, a creditor may establish that a debtor acted "willfully" by presenting circumstantial evidence. *J & A Brelage, Inc., v. Jones (In re Jones)*, 276 B.R. 797, 802 (Bankr.N.D.Ohio 2001).

> In making the determination that an injury is willful, in addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action.

*Ker v. Ker (In re Ker)*, 365 B.R. 807, 813 (Bankr.S.D.Ohio 2007) (internal quotation marks and citations omitted); *see also, O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr.N.D.Ohio 2000); *Rizzo v. Passialis (In re Passialis)*, 292 B.R. 346, 353 (Bankr.N.D.Ill.2003).

The Sixth Circuit has created a non-exhaustive list of types of behavior which may qualify as a willful and malicious injury for purposes of § 523(a)(6): intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel and deliberately vandalizing the creditor's premises. *Steier v. Best (In re Best)*, 2004 WL 1544066, *4 (6th Cir.2004). The determination of whether a debtor has committed one of these torts is made by looking to state law. *Parcels v. Gurzynski (In re Gurzynski)*,

443 B.R. 777, 780 (Bankr.N.D.Ohio 2010). Although one of the enumerated actions may have taken place within the meaning of state law, liability for one of the torts "does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)." *Superior Metal Prods. v. Martin (In re Martin)*, 321 B.R. 437, 441 (Bankr.N.D.Ohio 2004). "Whether [one of the enumerated torts] constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm or was substantially certain that such harm would occur." *Prime Fin'l. Servs., Inc., v. Brandenburg (In re Brandenburg)*, 2011 WL 830489 (Bankr.E.D.Tenn.2011) (citing *Sweeney v. Lombardi (In re Lombardi)*, 263 B.R. 848, 853 (Bankr.S.D.Ohio 2001)).

As Judge Stair recently recognized in the *In re Brandenburg* case:

> Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use and benefit in exclusion of defiance of the owner's rights." *Thompson v. Thompson*, 2009 Tenn. App. LEXIS 99, at *45, 2009 WL 637289, at *14 (Tenn.Ct.App. Mar.12, 2009); *see also Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn.Ct.App.1977) (defining conversion as an intentional tort requiring proof that a party appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property). "The main focus of the tort is the interference with an owner's property right [and t]he degree of this interference, as well as the impact on the property, determines whether there has been a conversion." *Gen. Elec. Credit Corp. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn.Ct.App.1988). "[W]hile they do appreciably overlap, liability for conversion does

not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)." *Superior Metal Prods. v. Martin (In re Martin),* 321 B.R. 437, 441 (Bankr.N.D.Ohio 2004). Whether an act of conversion constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm or was substantially certain that such harm would occur. *Sweeney v. Lombardi (In re Lombardi),* 263 B.R. 848, 853 (Bankr. S.D.Ohio 2001).

*In re Brandenburg,* 2011 WL 830489 at *10.

In a case very similar to the one at bar, *Koenig v. Whitaker (In re Whitaker),* 2008 WL 4279819 (Bankr.E.D.Tenn.2008), *aff'd Whitaker v. Koenig,* 418 B.R. 265 (E.D.Tenn.2009), the plaintiff and debtor entered into a residential construction contract whereby the debtor agreed to build a $1,188,298 house for the plaintiffs. The contract called for plaintiffs to make periodic disbursements to the debtor "based on work performance and materials delivered." *Id.* at *1. Work was to begin upon payment of the first installment of $60,000. Plaintiffs made that payment and construction began. Three months later, the debtor contacted the plaintiffs and asked for another $60,000 draw. Plaintiffs made that payment and shortly thereafter work on the house ceased. Approximately 4 months later the plaintiffs brought a lawsuit in state court seeking recovery of the second $60,000 payment. By agreement of the parties, and upon payment by the debtor of $15,000 to the plaintiffs, the state court trial was continued. Before the trial could commence, the debtor filed for bankruptcy relief. Plaintiffs brought an adversary proceeding alleging that the second $60,000 payment was obtained by the debtor through false pretenses, false representations or actual fraud. Plaintiffs also alleged that debtor "willfully and maliciously converted the $60,000 they paid him on

May 19, 2006, [the second $60,000 payment] for his own benefit and did not use the money for the purposes for which it was advanced; i.e. to pay expenses incurred on their project." *Id.* at *2. The plaintiffs sought a non-dischargeable judgment against the debtor under 11 U.S.C. § 523(a)(2)(A) and/or (6).

At the trial on their adversary complaint in the debtor's bankruptcy case, the plaintiffs presented copies of the debtor's bank statements at the time the second $60,000 draw was made. The records clearly demonstrated that the debtor did not use the plaintiff's money to pay for expenses on their project. Instead, the debtor paid debts for other jobs he had going on at the time. In defense of the proceeding, the debtor alleged that he incurred expenses attributable to the plaintiff's job after payment of the second $60,000 draft.

> The court found this allegation to be immaterial to the case: The fact that the Defendant may have incurred expenses attributable to the Plaintiffs' project after May 19, 2006, does not alter the fact that he obtained the $60,000.00 payment only upon representing to the Plaintiffs that he needed it to pay existing and "large, upcoming expenses that he needed to have the money for" on their project. It is clear that the Defendant never intended to use these funds to pay the Plaintiffs' expenses. Although there is nothing in the Residential Construction Contract requiring the Defendant to keep the Plaintiffs' funds segregated from other funds, he was nonetheless under an obligation to use the Plaintiffs' money as he had represented.

*Id.* at *5.

After reviewing the evidence before him, Judge Stair found that the debtor's actions amounted to conversion under Tennessee law and were both willful and malicious within the meaning of the Bankruptcy

Code. *Id.* at *7. Judge Stair based his finding of malice on the fact that the debtor's representation that he needed the second $60,000 draw in order to pay for expenses for the project was "knowingly false and thus evidenced an intent to deceive in conscious disregard of the Plaintiffs or the Defendant's obligations to them." *Id.* Judge Stair based his finding of willfulness on the fact that, at the time of receiving the plaintiff's second $60,000 payment, the debtor was experiencing financial problems:

> Given his financial problems and his lack of income from other sources, the Defendant obtained the $60,000.00 from the Plaintiffs, never intending to use it for the reasons represented to the Plaintiffs. Rather, his intention from the outset was to convert the Plaintiffs' funds to his own use to pay invoices from "suppliers yelling the loudest" and not suppliers associated with the construction of the Plaintiffs' home.

*Id.* at *7, see also Whitaker v. Koenig,* 418 B.R. 265, 275 (E.D.Tenn.2009) (In affirming the bankruptcy court decision, the district court found no clear error in the bankruptcy court's finding that the debtor's actions were willful: "The Bankruptcy Court found appellant's actions to be 'willful' because he obtained the May 19, 2006 payment from appellees not intending to use it for the reasons he represented to the appellees. The Bankruptcy Court considered this sufficient evidence either of appellant's intent to convert appellees' funds to his own use, or of a belief on the part of appellant that the conversion was substantially certain to result from his act. This Court finds no error in the Bankruptcy Court's judgment."). Based upon his finding that the debtor's actions were willful and malicious, the court awarded the plaintiff's a non-dischargeable judgment pursuant to § 523(a)(6) of $45,000 (the $60,000 payment minus the $15,000 previ-

ously paid by the debtor to the plaintiffs). *Id.* at *8.

In the case at bar, Morrison and Stephens entered into a similar type of construction contract as the one in *Whitaker.* Stephens agreed to make periodic payments to Morrison for completion of the remodel and addition. Morrison agreed to finish work on the house in a very short period of time so that the house could be finished by the time the Stephens' baby was born. The evidence demonstrated that work did not even begin on the house by the original completion date to which Morrison agreed. It then dragged on for over a year, at which time the project was nowhere near completion. It is true that Morrison, like the debtor in *Whitaker,* continued to work on the house after payment of the installments; however, the only evidence Morrison could submit to the Court of this work was the receipts for the supplies and the cancelled checks for the labor done by third parties. He presented no evidence of any other work taking place on the project other than those exhibits.

Like the debtor in *Whitaker,* Morrison's bank records in this case demonstrate that he used the funds deposited in his account for much more than the expenses of Stephens's project. Out of the $128,871.00 Stephens paid Morrison, Morrison can only prove that he spent $58,227.75 on Stephens' job. His bank records show that he spent a significant portion of the remaining $70,642.25 on what appear to be primarily personal expenses. Although it is true that collective exhibits 25 and 26 demonstrate that Morrison invested at least some labor on Stephens' project, Morrison failed to introduce any evidence of how much time he spent on the job or how he calculated his wage. The only testimony he gave about his labor was that he paid himself $15/hour for general labor

and more for electrical or plumbing work; however, when asked by Stephens's counsel at trial, Morrison was unable to say what those rates were.

At all relevant times in this case, Morrison knew he agreed to remodel Stephens's house and build an addition onto it. The jobs he was to perform were clearly set forth in the original construction contract and in the additional charges sheet. Morrison knew that every dime Stephens paid him was for use on that project. He was to use the funds for supplies and labor. The contract provides that Morrison was to begin work on Stephens's project in October 2006; however, Stephens testified that four months into the project Morrison still had not begun work. Morrison's tardiness, however, did not stop him from spending Stephens's money on more than just the project. Prior to beginning work on the house, Morrison's records show, and Morrison admitted during his testimony, that he spent over $16,000 on personal expenses. If he had not begun work on Stephens's project at the time he paid those expenses out of the money from Stephens, there is no way Morrison can claim he was entitled the money as payment for his labor. No work means no labor.

The evidence in this case definitely shows that Morrison's actions were both willful and malicious. Morrison produced records which demonstrate he spent $37,867.84 for supplies and $20,359.91 on labor for Stephens's job. There are no records, however, to show what happened to the remaining $70,642.25 of Stephens's money aside from Morrison's bank statements which demonstrate that a good portion of this money was spent on Morrison's personal expenses.

Given the fact that Morrison admitted, and the bank records prove, that he spent over $16,000 on his personal expenses prior to even beginning work on Stephens's

project, there is no conclusion for the Court to reach except that Morrison's actions were willful. From the moment he began spending Stephens's money on expenses other than for the job, he had to have known, with substantial certainty, that he was misappropriating Stephens's funds for his own use. Morrison was tardy in starting labor on the job even though he agreed to complete the work in 3 months. The job then dragged on for over a year and, at the conclusion of that time, the job was only 30% finished. Assuming for the sake of argument that Morrison had completed the job, the $37,867.84 he had already spent fully paid for all the supplies he would need, and the $20,359.91 he paid to laborers would have covered all his third-party labor expenses, then the remaining $70,642.25 in Stephens's money would have gone to Morrison for his labor. If the job was only 30% completed at the time Moore took over the job, then the most Morrison would have been entitled to would have been 21,192.68. And, in order to even make that finding, Morrison would have had to present some evidence to this Court to substantiate his entitlement to that amount.

All of this evidence also indicates that Morrison acted maliciously in spending a large portion of Stephens's money on his personal expenses. The exhibits and testimony clearly demonstrate that Morrison had not earned most of the money he used for his personal expenses. At the time of entering into the contract with Stephens, Morrison was clearly aware of what tasks he had been hired to complete and the enormity of the job. The contract very clearly set forth what Morrison agreed to do in exchange for the $128,871 Stephens paid him. When he failed to work on the project and then spent Stephens's money on his personal expenses, he acted in conscious disregard of his duties without just cause or excuse. This conclusion is fur-

ther bolstered by the fact that Morrison spent a good portion of Stephens's money on his personal expenses prior to even beginning work on the job.

■■■■■ Although the Court was unable to use the Carroll County Chancery Court breach of contract judgment as a basis for awarding summary judgment to Stephens, this Court may not recalculate the state court's determination of damages in that action. Pursuant to the Full Faith and Credit Statute, codified at 28 U.S.C. § 1738, lower federal courts must give full faith and credit to a state court default judgment if the "law of the State in which the judgment was rendered" would give the judgment preclusive effect. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 1329, 84 L.Ed.2d 274 (1985). This doctrine applies in bankruptcy non-dischargeability proceedings and bars a court from reevaluating the amount of damages previously awarded by a state court in a default proceeding. *Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 322 (6th Cir. 1997). Tennessee gives preclusive effect to state court default judgments. *Lawhorn v. Wellford*, 168 S.W.2d 790, 792 (Tenn.1943). As a result, the Court will enter an order finding the $64,300 plus interest as awarded by the state court to be a non-dischargeable judgment pursuant to 11 U.S.C. § 523(a)(6).

## ORDER RE: COMPLAINT OBJECTING TO DISCHARGEABILITY

FOR THE REASONS set forth in the Court's Memorandum Opinion re the Complaint Objecting to Dischargeability, the Plaintiff is hereby **GRANTED** a non-dischargeable judgment against the defendant in the amount of $64,300 pre-judgment interest of 10% per annum since December 3, 2007, pursuant to 11 U.S.C. § 523(a)(6).

It if further **ORDERED** that the plaintiff's claims for judgment pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 727(a)(3) are **DENIED.**

**IT IS SO ORDERED.**